IN THE

# SUPREME COURT OF APPEALS

OF

# VIRGINIA.

Richmond.

THOMAS v. TURNER'S ADM'R & AL.

November 6th, 1890.

1. ATTORNEY AND CLIENT—*Contract for Fees—Rule.*—Dealings between attorney and client for former's benefit, are presumptively invalid as constructively fraudulent, and the *onus* is on him to show that the contract was perfectly fair, and was entered into by the client freely and with full understanding as to his rights and to its effect.
2. IDEM—*Construction of Statutes.*—Code 1873, ch. 160., Sec. 2, enacting that " any contract made with an attorney for other or higher fees shall be valid and may be enforced in like manner with other contracts" does not apply to an agreement made *after* the relation of client and attorney is established.
3. IDEM—*Case at Bar.*—The contract made under the circumstances stated in the opinion of the majority of the court: *held,* invalid but permitted to stand as security for what was justly due under an implied contract.

Appeal from decree of circuit court of Nelson county, rendered at its September term, 1888, in a suit in equity wherein

Thomas P. Fitzpatrick, administrator *de bonis non* with the will annexed of Lemuel Turner, deceased, was plaintiff, and Emily R. Thomas and others were defendants. The controversy grows out of a certain written assignment, executed by the said Emily R. Thomas, on the 18th of December, 1886, for the benefit of the said Thomas P. Fitzpatrick, for services previously rendered by him as her attorney.

It appears from the record that Lemuel Turner died in December, 1878, seized and possessed of a considerable estate, real and personal. By his will, after devising certain real estate to his nephew, John T. Dillard, and making a bequest of four thousand dollars to Frank P. Turner, he left the residue of his estate to J. L. S. Kirby, in trust, for the sole and separate use of the said Emily R. Thomas for her life, with power of appointment by will, and provided that in default of such appointment, the estate, at her death, should go to her heirs and next of kin. The said Emily was a natural child of the testator, and is described by him in the will as "a highly valued colored servant-woman, formerly my slave, and now in my employ." The will was duly admitted to probate, and John T. Dillard, who was named therein as executor, qualified as such in the county court of Nelson county, at its February term, 1879. Soon afterwards, however, his powers as executor were revoked, and the said Thomas P. Fitzpatrick was appointed administrator *d. b. n. c. t. a.*

The testator lived to an old age, and never married. Soon after the execution of the will, and not long before his death, a suit was commenced in the circuit court of Nelson county against him by Narcissa E. Dillard, his sister, in which suit large claims were asserted against him, growing out of his transactions as executor and trustee under the will of his father, Terisha Turner, who died in 1841. These claims aggregated over fifty thousand dollars, and, if established, would have, probably, absorbed his whole estate. Nothing was done in the suit until after Fitzpatrick's qualification as

administrator, when he undertook to defend it. He had been previously employed by the said Emily R. Thomas as her general counsel, and, as administrator, he retained Robert Whitehead, Esq., a member of the Nelson bar, to represent the estate, and to assist him in the litigation. The suit finally resulted in the circuit court in a decree against the estate for about eighteen thousand dollars. From this decree Fitzpatrick, as administrator, appealed to this court, where the decree was reversed and the bill dismissed, on the ground of *laches*, death of parties, loss of evidence, etc. The case was decided here at the November term, 1886, and is reported under the style of of *Turner's Adm'r* v. *Dillard's Ex'or*, 82 Va., 536.

On the 18th of December, 1886, soon after the decision of the case by this court, the instrument in question was executed. It purports to assign, after payment of the debts, etc., to the said Thomas P. Fitzpatrick, in consideration of his past services as attorney, the interest on all the moneys and *choses in action* belonging to the residuum of the estate from the death of the testator, in 1878, until the 1st of January, 1890, a period of about eleven years, and in addition thereto five thousand dollars of the principal.

The contract is as follows:

"Whereas, by the will of Lemuel Turner, deceased, after certain specific legacies and bequests, the whole residuum of the estate of the said Lemuel Turner, both real and personal, was given and passed to the undersigned, Emily R. Thomas, in trust for life, with the power of appointment by will at her death, which residuum was first chargeable, under the law, with the payment of the debts of the said Lemuel Turner; and whereas, at the death of the said testator, a suit was pending in the circuit court of Nelson county, instituted by Narcissa E. Dillard, claiming a debt to be due by the said Lemuel Turner, amounting, according to the *pretention* of the plaintiff, to between twenty and thirty thousand dollars,

which, if established, would have been sufficient to absorb
the whole estate; and whereas, at the hearing of said cause
by the said circuit court of Nelson county, a decree was en-
tered ascertaining and fixing the debt for which the said
estate was liable at about eighteen thousand dollars, which, if
paid, would have been paid out of the residuum of the estate;
and whereas, the undersigned did, at the institution of said
suit, employ Thomas P. Fitzpatrick as her counsel to repre-
sent her interest in all things connected with the said estate,
and to preserve and protect the same from the claim so as-
serted; and whereas the said Thomas P. Fitzpatrick, as coun-
sel aforesaid, did diligently and with energy, and with great
labor, attend to the preparation of said cause in the circuit
court of Nelson county, so as to reduce the claim of the plain-
tiff to the said sum of about eighteen thousand dollars, show-
ing that that sum was the maximum which appeared to be
due; and whereas the said Thomas P. Fitzpatrick, as counsel
aforesaid, did obtain a writ of error and *supersedeas* to the
decree of the circuit court of Nelson, and did prosecute the
same in the supreme court of appeals of Virginia to success-
ful issue, whereby the decree of the circuit court of Nelson
was reversed and set aside, and the bill of the plaintiff dis-
missed with costs, thus relieving the estate of the said Lemuel
Turner from all liability on account of said claim; and
whereas it has been decided by the circuit court of Nelson
county, in another proceeding, that the said Emily R. Thomas
is entitled to the whole estate, both real and personal, to use
and dispose of the same as her sole and separate estate for
and during her natural life; and whereas the said Emily R.
Thomas is not only willing, but anxious, that the said Thomas
P. Fitzpatrick should be fully and amply paid for all of his
services as counsel for the said estate, *independent of the fee
and allowances to him as adm'r,* believing, as she does, that
without his counsel and management that she would have
been deprived of and lost the most, if not all, of the *principle*

and interest of the residuum; and, in order to compensate the said Thomas P. Fitzpatrick for his services aforesaid as far as she can, she, the said Emily R. Thomas, doth transfer, assign, make over and release to the said Thomas P. Fitzpatrick *all the interest which has or shall accrue on all the moneys, debts, or choses in action* belonging to the estate of the said Lemuel Turner, and embraced in the residuum from the death of the said Lemuel Turner *up to the 1st of January,* 1890, subject to the payment of the debts due by the said Lemuel Turner and the pecuniary legacy of Frank P. Turner, to be deducted from the *principle* of said money and *choses in action* as if paid and discharged as of the date of the death of the said Lemuel Turner, the said Emily R. Thomas being entitled to the annual interest on the balance of said fund, which she hereby intends to transfer and assign to Thomas P. Fitzpatrick in part compensation for his services. And she further transfers and assigns to Thos. P. Fitzpatrick, so far as she may and can lawfully do, the further sum of five thousand dollars *of the principle of the said fund,* and earnestly requests that the circuit court of Nelson county will approve, ratify, and confirm the same in any settlement of accounts which the said Thomas P. Fitzpatrick may make as adm'r of Lemuel Turner, dec'd, she being satisfied that that amount of the *principle* of the estate should be appropriated for his services for preserving the said *principle,* which assignment of *principle* she would willingly make absolute if she was authorized to do so without the sanction of the court; but if the court should fail or refuse to approve and ratify the foregoing assignment of *principle,* then, to compensate the said Thos. P. Fitzpatrick for his services as far as she can, she, the said Emily R. Thomas, doth transfer, assign, make over, and release to the said Thomas P. Fitzpatrick, his heirs and assigns forever, all the interest and profits accrued and to accrue upon all the funds which *has* or may arise from the money, debts, or choses in action belong-

ing to the estate of Lemuel Turner, dec'd, for and during the natural life of the said Emily R. Thomas, the said Thos. P. Fitzpatrick and his assigns to receive and hold said interest and profits, and use and enjoy the same without accountability to any one.

"She, the said Emily R. Thomas, willingly makes this agreement and assignment, and requests the court to ratify the same, it being much less than she was willing to give, and proposed to give, during the litigation, and is to be in addition to a reasonable and liberal fee paid to Robert Whitehead as counsel in said cause.

"In witness whereof the said Emily R. Thomas has, this the 18th day of December, 1886, set her hand and affixed her seal.

her<br>
"EMILY R. ⋈ THOMAS."<br>
mark.

To this instrument, as will be observed, the said Emily R. Thomas, she being unable to read or write, affixed her mark by way of signature, and there is appended to it a certificate of John J. Camp, a justice of the peace, to the effect that it was signed by her in his presence, after having been read and explained to her, and that she signed it willingly. There is also an endorsement on the paper, purporting to be by Peyton Thomas, her husband, giving his approval of the paper, to which endorsement his mark was affixed. Her three adult children, a few days afterwards, also endorsed their approval on the paper, which endorsement is signed by each of them.

Shortly afterwards the bill in the present case was filed by the said Thomas P. Fitzpatrick, as administrator as aforesaid, the object of which, among other things, was to have a settlement of his administration accounts, and to obtain a decree confirming the above-mentioned assignment as to Van Trump Thomas, the only infant child of the said Emily. The latter, who together with all her children and others were made defendants, answered the bill, averring that in her ignorance

she had executed the instrument under a misapprehension of its purport; that she thought by executing it she had merely given her consent to a payment of five thousand dollars out of the *corpus* of the estate, and no more. The answer also avers as follows:

"Respondent is informed that the personal estate, money, *choses in action*, etc., the interest on which from 1878 to January 1, 1890, the contract assigns and surrenders to complainant as an additional fee, will amount to a sum of $4,000 to $6,000, which, if paid complainant, will make his fee for preserving the estate, or rather saving to it about $18,000, as much as $10,000 or $12,000, provided he should also be allowed $5,000 out of the principal of the estate, and this in addition to his commissions, which will also aggregate a considerable amount, besides other fees for services to the estate."

To this answer there was a general replication, and upon the issue thus made up, testimony was taken. The plaintiff was examined as a witness in his own behalf, and, among other things, testified as follows:

"After the case of *Dillard* v. *Turner* was decided in the Court of Appeals, and we had won it, I sent word by Peyton Thomas to Emily to come up to Arrington and meet me on a certain day in order that we might fix the fee that I was entitled to; they both came on the day fixed, and I said to Emily in the presence of Peyton and of my son, W. C. Fitzpatrick, that we had won the case and whipped the Dillards out and obtained a judgment for costs, and that she had told me while the case was being litigated that if I could save for her and her children the "Bob's Creek" farm, upon which she lived, she was willing for me to have the balance of the estate for my trouble; I asked her if she remembered it, she said yes, and I am willing to do it now. I told her she did not have the right to do it, and if she did I would not take it, that she could not contract to give me any part of the principal of that estate without the sanction of the court, as she had

a life estate with the power of appointment by will, and in default of appointment by will it would go to her children; and as her son, Van Trump, was under age, the court would have to act for him; but as to rents of the lands and interest on the money, she had full power over that to do as she pleased with it, the court having so decided in her suit against J. L. S. Kirby, Trustee. I told her I would be satisfied if she would give me all the interest on the personal fund up to the 1st of January, 1890, I think, which she had a right to do without calling upon the court, and in addition thereto give me $5,000 out of the principal of the estate for preserving that principal, which the court would have to confirm, because of the infancy of Van Trump, her son. I wanted her and her husband to sign such a contract, if she was willing and her three older children, who had a contingent remainder interest in the $5,000 of the principal. She said she wanted to satisfy me and pay me well, that she believed if she had employed anybody else in the case but me she would never have gotten a cent out of Mr. Turner's estate. *I told her I had such a paper prepared.* I further told her that if the court didn't approve and would not confirm the arrangement as to the $5,000 in which the infant was interested, that then she *must give* me the interest, not only up to 1890, on the personal estate, but as long as she lived, because if I was restricted to the interest only and got none of the principal I would not get a sufficient fee and would not be satisfied with it. We all went into my counting-room and the contract was read over to her slowly and distinctly, in the presence of her husband, by my son, W. C. Fitzpatrick, who wrote it. I had intended to get Judge Brown, who was a lawyer, to read and explain the contract to her, and asked him to be there, but he could not attend from some cause on that day. I then got Mr. J. J. Camp, an old justice of long experience, to attend to the matter. When he came in, the matter was talked over and explained by me again in the presence of Mr. Camp, and the

contract was again read to Emily by my son in the presence of her husband and of Mr. Camp, and section by section explained by me as it was read—my object being that she should fully understand and comprehend the paper before she signed it. All questions that she asked were answered in public, either by myself or Mr. Camp, who undertook to explain the paper to her. After the matter was fully talked over and explained, Mr. Camp told Emily he thought I was liberal with her considering the work I had done and the estate I had gotten her, and advised her to sign the contract. She said she was willing to do so, and did sign it or have it signed for her, as also did her husband. And after she signed it she remarked that I was not *as hard on her as she expected,* as she did not expect me to charge less than $10,000. I told her she was the richest person in the county; that she owned more land; that the personal estate would pay all the debts and the balance on Frank P. Turner's legacy, all the costs of administration, my fee as agreed under the contract, and I thought there would be a balance going to her of from $3,000 to $5,000, but as to that I could not speak definitely, it was mere *surmise,* as the matter had to be settled up before a commissioner, which I was anxious to have done. She left well satisfied, and I never heard anything to the contrary until some time last month, when I got information that she was dissatisfied in some way."

W. C. Fitzpatrick, a son of the plaintiff, was also examined, and testified that he usually does his father's writing for him, who, on account of nervousness, writes badly, and that he wrote the contract in question. He says it was carefully read and explained to Emily in the presence of her husband, Peyton Thomas, Thomas P. Fitzpatrick, and Mr. Camp, the justice, before she signed it, and that she said she understood it and was willing to sign it, and did make her mark to it. He also testified that while she was in the room she was reminded that she had repeatedly said if she got " Bob's Creek " farm she

would be willing to give Thomas P. Fitzpatrick all the rest, to which she replied she would do so then if he required it, but hoped he would not be too hard on her. He also says she seemed very grateful for the service he (the plaintiff) had rendered her in the suit.

John J. Camp, the justice who took her acknowledgment also testified, saying the contract was carefully read and explained to her, and that she expressed herself perfectly satisfied, and signed it willingly. He admitted, however, on cross-examination, that his *impression* of the contract at the time was that it was for a fee of five thousand dollars only.

Emily R. Thomas testified as follows:

1. Ques. Can you read and write?

Ans. No, sir.

2. Ques. State what you understood you were to pay Capt. T. P. Fitzpatrick as fee for his services in the suit of *Dillard* v. *Turner*, under the contract signed by you and which is filed as an exhibit with the bill in this cause.

Ans. Five thousand dollars out of the principal money.

3. Ques. Did you understand that, in addition to the $5,000 out of the principal money, you were to pay him the interest on the money, choses in action, &c., from the death of Mr. Turner to 1st January, 1890?

Ans. He said the $5,000 was all that I owed him for what he had done, and I thought that was plenty.

4. Ques. Do you mean to say that your reply to Capt. Fitzpatrick was that the $5,000 out of the principal money was plenty?

Ans. Yes, sir; I do.

5. Ques. State the circumstance connected with your signing the contract aforesaid.

Ans. I signed the contract for $5,000, and he told me that was everything I owed him for what he had done. Mr. Camp told me it was a liberal fee and he thought I might sign that. I was not willing to sign it until he told me.

6. Ques. Was Mr. Camp the magistrate who took your acknowledgment to the contract?

Ans. Yes, sir.

7. Ques. Did Mr. Camp tell you anything about what you were signing the contract for ?

Ans. No, sir; he did not; only the $5,000 I knew anything about.

8. Ques. Who first asked you to sign the contract? State the circumstances under which you were called to sign it.

Ans. Capt. Fitzpatrick; he asked me to sign the contract for $5,000 out of the principal money; he said all the balance was mine after I paid him the $5,000. I asked him how much was the balance, and he said he did not know how much it was. I said I thought the $5,000 out of the principal money was enough, and I told him it was enough at the time.

9. Ques. Did you say anything about not understanding the contract at the time of signing it?

Ans. Yes, sir; I told him I did not understand it; he read it twice to me, and I told him I did not understand it. I understood the $5,000, and told him that was all I was willing to give.

10. Ques. Did you make any contract with Capt. Fitzpatrick (the plaintiff) about a fee before the contract was signed?

Ans. No, sir; I did not.

M. K. Estes, sheriff of Nelson county and substituted trustee for Emily R. Thomas, testified that soon after his appointment as her trustee she asked him for a settlement of the personal fund, and that he replied she had assigned her interest on the money to Capt. Fitzpatrick up to 1890. She seemed to be surprised, he said, and remarked that she had assigned nothing but $5,000 out of the principal fund, and that if there was any other assignment made she did not make it. "That," he added, "seemed to be the first she knew of anything more than the $5,000 from the principal sum being in the contract."

It ought also to be stated that the plaintiff, on his cross-

examination, in answer to the question, "when the contract was read over to Emily, the day she signed it, did she not say she did not understand it during the conversation?" answered, "I don't know. I have no recollection of her saying she did not understand it, but she may have said so as to some of its provisions." He was very particular, however, he added, in explaining it to her, and thought she understood it.

When the cause came on to be decided, the circuit court being of opinion that the contract was valid as to the adult parties, and that it ought to be confirmed as to the infant defendant, Van Trump Thomas, decreed accordingly, and from that decree Emily R. Thomas was allowed an appeal by one of the judges of this court.

*Daniel Harman, Jr.,* for the appellants.

*J. Thompson Brown,* for the appellees.

LEWIS, P. (after stating the case), delivered the opinion of the court.

Tested by the equitable and wisely-established rule which applies to such cases, it is very clear that the decree upholding the transaction in question is erroneous. According to that rule all dealings between attorney and client for the benefit of the former, are not only regarded with jealousy and closely scrutinized, but they are presumptively invalid, on the ground of constructive fraud; and that presumption can be overcome only by the clearest and most satisfactory evidence. The rule is founded in public policy, and operates independently of any ingredient of actual fraud, or of the age or capacity of the client, being intended as a protection to the client against the strong influence to which the confidential relation naturally gives rise.

It is the duty of an attorney to give to his client the benefit

of his best judgment, advice, and exertions, and it would be a just reproach to the law if he were permitted to bring his own personal interest into conflict with that duty by securing a benefit to himself through the influence which the relation implies. All transactions between the parties, to be upheld in a court of equity must be *uberrima fides*, and the *onus* is on the attorney to show, not only that no undue influence was used, or advantage taken, but that he gave his client all the information and advice as against himself that was necessary to enable him to act understandingly. He must show, in other words, (1) that the transaction was perfectly fair; (2) that it was entered into by the client freely; and (3) that it was entered into *with such a full understanding of the nature and extent of his rights*, as to enable the client to thoroughly comprehend the scope and effect of it. Or as Lord Eldon tersely puts it in the famous case of *Huguenin* v. *Baseley*, 14 Ves., 273, the transaction must be shown to have been the "pure, voluntary, and well-understood act" of the client's mind, otherwise a court of equity will undo it, as having been unduly obtained. And in the later case of *Smith* v. *Kay*, 7 H. L. Cas., 750, Lord Crannorth remarked that there is no branch of its jurisdiction which a court of equity is more ready to exercise than this.

Before entering on the business of his client, an attorney may contract for the measure of his compensation, and a contract then made will stand on the same footing as any contract between other persons competent to contract. This is now settled by the statute. Code, sec. 3201. But a contract for compensation made after the fiduciary relation has commenced, and while it continues, will not be upheld in equity, unless it be shown not only to be reasonable, but that it was entered into under the circumstances just mentioned. Indeed, the established rule, broadly stated, is, that an attorney who occupies a security or other benefit from his client, must show that the client had the information and advice which he presumably would have received, and that he is not worse off than he

presumably would have been, if he had consulted a competent adviser, who had no selfish end in view. And especially is this so when the transaction is connected with the subject-matter of litigation, as then the confidence reposed and the influence of the relation place the client most in the power of his attorney, *Gray* v. *Emmons*, 5 Mich., 533; *Dickinson* v. *Bradford*, 59 Ala., 581; *Planters Bank* v. *Hornberger*, 4 Cald., 531; *McMahan* v. *Smith*, 6 Heisk., 167; *Evans* v. *Ellis*, 5 Denio, 640; *Wistar's Appeal*, 54 Pa. St., 60; *Jennings* v. *McConnel*, 17 Ill:, 148; *Brock* v. *Barnes*, 40 Barb., 521; *Yeamans* v. *James*, 27 Kans., 195; *Stockton* v. *Ford*, 11 How., 232; 2 Pom. Eq., sec. 960; 2 Lead. Cas. Eq. (4th ed.), 1217, notes to *Huguenin* v. *Baseley*.

In *Brock* v. *Barnes*, where a security was taken by the attorney from his client, the court used this language: "If the instrument be deemed to provide a remuneration for past services, then the services must be proved; and further, that there existed at the time of giving it, if not a legal, binding indebtedness, at least a just and moral obligation to pay; and still further, that the instrument was fully understood by the client, and was made in pursuance of, and in accordance with, a well-considered, definite, and settled purpose. The paper itself, having been executed by a client to his attorney, affords no presumption on these points."

This may sometimes bear hardly on the attorney, but the hardship is one to which he exposes himself by dealing for his own advantage with one whose interests intrusted to his care he is bound to protect, and over whom he presumably has an influence that may be abused.

The rule is well expressed by Mr. Justice Story, who says: "The situation of an attorney or solicitor puts it in his power to avail himself, not only of the necessities of his client, but of his good nature, liberality, and credulity, to obtain undue advantages, bargains, and gratuities. Hence, the law, with a wise providence, not only watches over the transactions of par-

ties in this predicament, but it often interposes to declare transactions void, which between other persons would be held unobjectionable. It does not," he adds, "so much consider the bearing or hardship of its doctrine upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means, secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties." 1 Story Eq., sec. 310.

Nor is the rule confined to the case of attorney and client, but applies as well to that of administrator and legatee, guardian and ward, trustee and *cestui que trust*, and, indeed, to all the variety of relations in which influence or dominion may be exercised by one person over another. *Davis* v. *Strange's Ex'or*, 86 Va., 793; *Fishburne* v. *Ferguson*, 84 Va., 87, 113; In the often cited case of *Gibson* v. *Jeyes*, 6 Ves., 266, the Lord Chancellor, in delivering judgment, said: "It is asked, where is that rule to be found? I answer, *in that great rule of the court*, that he, who bargains in matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying to trustees, attorneys, or any one else." Nor is this rule affected by the statute above mentioned, the object of which was, simply, to make the fees of an attorney a lawful subject-matter of contract. And as the rule is founded on the influence which the relation originates, it will operate as long as the influence continues, although the relation itself has ceased. *Wood* v. *Downes*, 18 Ves., 120; *Henry* v. *Raimen*, 25 Pa. St., 354; *Sedgwick* v. *Taylor*, 84 Va., 820; Weeks, Attorneys, sec. 268, *note*.

These principles are well illustrated by the case of *Statham* v. *Ferguson*, 25 Gratt., 28. In that case the widow of a decedent and his administrators and a number of the heirs-at-law and next of kin, united in a deed whereby the widow agreed to accept, in lieu of her interest in the estate, the provision made

for her in a certain paper writing intended by the decedent as his will, but probate of which had been refused, because of its defective attestation. Before the deed, which was prepared by the counsel of the administrators, was read to her, she was told what her rights were under the intended will, and what they were by law independently of it. She was also told that by executing the deed she would sustain a considerable loss. She answered she was aware of that, and after the deed was read she expressed herself as satisfied, and signed it. She soon afterwards, however, instituted a suit to set it aside, and the court being satisfied that she had executed it hastily and without any definite idea of the value of the estate, or of the effect of the deed upon her interest, declared it invalid.

"It was the duty of the administrators," said the court, "invested as they were by law with the title to the whole personal estate, and standing as they did in the confidential relation in which they stood towards her, to take care that before she made a donation of her estate, or a large portion of it, to themselves, as she did, she should be fully informed of her rights on the subject, and the effect of her act, or at least should have ample time and opportunity to consult counsel and advise with disinterested friends; and they should have advised her to avail herself of those advantages. That *uberrima fides,* which the law expects and exacts of persons standing in such a confidential relation to another, required them to do so. Instead of doing so, if they did not advise and encourage, they, at least by their acts, facilitated the preparation and execution of the deed, when they must have known that she had not the necessary information and proper advice to enable her to act wisely and discreetly in so important a transaction."

These remarks apply with peculiar force to the present case, not only because the case in its facts resembles the present, but because here, when the contract was executed, the appellee held to the appellant a relation that was doubly confidential;

that is, he was not only her adviser and attorney, but he was the administrator *d. b. n.* with the will annexed, and she the principal legatee.    True, he says the litigation had ended, and that the relation of attorney and client had ceased; but nothing is clearer from the record, than that if the relation had ceased, the influence growing out of it had not.    The contract was executed, if not before, certainly only a few days after, the order of this court was certified down to the circuit court. Moreover, it appears that he was retained by her as general counsel, before the litigation commenced, and it does not appear that that relation had been either dissolved or suspended. But be that as it may, the relation of administrator and legatee was subsisting at the time and continues to the present time.

Then, was the contract made voluntarily? Did the appellee fully and candidly explain to the appellant the nature and extent of her rights? And did she thoroughly comprehend the scope and effect of her act? All of these questions we are constrained to answer in the negative. Indeed, the case seems to have been treated in the circuit court as though the *onus* was on her to prove actual fraud, which, as we have seen, is exactly the reverse of the true rule relating to such transactions.

There is no proof of any contract for a fee, or of any suggestion of an assignment, or other security, prior to her appearance before the appellee, in obedience to his summons, when the contract, which he had previously prepared, was produced and read to her. At that time she had just emerged from a litigation which had threatened her all, and which had been successfully conducted for her by the appellee. She was, moreover, an ignorant woman, unused to the transaction of legal business. Nothing, therefore, was more natural than that there should have been the fullest confidence reposed, on the one side, and the strongest influence, on the other, which was no doubt heightened or intensified by a sense of relief and gratitude which the result produced.

This, indeed, is manifest from the record. The contract itself shows it, especially that clause wherein she declares her belief that without *his* counsel and management, all would have been lost. And other instances of his influence, not to say ascendancy, over her are shown by the evidence. Thus, he himself testifies that he told her, when he sent for her to sign the contract, that she *must give* him the income on the whole personal fund, during her life, if the court should not approve a payment of five thousand dollars out of the principal as to her infant son, otherwise he would not be satisfied, which no doubt strongly influenced her to sign the contract, and to ask the court, as she did, to confirm it. Then her remark, after the contract was signed, which he also mentions in his deposition, namely, that he had "not been *as hard* on her as she expected," is not a little suggestive of a situation of dependence.

To the same purport is the evidence of W. C. Fitzpatrick, the appellee's son, who says he heard her say, as the contract sets forth, that if she had employed any other attorney, she believed she would not have gotten anything. The same witness also says that while she was in the room, where the contract was signed, she was reminded (he does not say by whom) that she had repeatedly declared if she got "Bob's Creek" farm, she would be willing to give Mr. Fitzpatrick (the appellee) all the rest, and that she replied, she would do so then "*if he required it,*" but "she *hoped* he would not be *too hard* on her." He also says she seemed "*very grateful;*" all of which, to say nothing of any other evidence in the case, shows very clearly that the contract, instead of being an act of rational consideration, an act of pure volition uninfluenced, was rather the impulsive, hasty, and unadvised act of one who, to use the surprisingly apt language of the appellee's own counsel, was under a "generous thraldom of gratitude" to the attorney whom she regarded as her "deliverer." In other words, she was subject to the influence originated by a confidential relation.

It is argued she had a right to be generous, and so she had,

and she evidently meant to be; but that, instead of helping the appellee's case, is a strong circumstance against it. The learned counsel seemed to have forgotten that it was as much the appellee's duty to put her on her guard against her own generous inclinations as against himself. A disinterested, competent adviser, had such a one been consulted, presumably would have done so, and, in view of his large personal interest in the matter, and her ignorance and inexperience, he ought to have recommended to her to seek such advice; for, as was well said in *Doswell* v. *Anderson*, 1 P. & H., 185, when the interest and duty of a fiduciary are placed in opposite scales, we need no law books to teach us which will preponderate. Independent advice, it is true, was not essential to the validity of the contract, but, as a precaution against undue influence, it is always proper, and would have been especially so in the present case.

There is no principle of equity, therefore, upon which the contract in question can be made to stand. The rule we have mentioned was intended to prevent it; or, in other words, to shut the door as well against the temptation of an attorney to take advantage of the unguarded generosity as of the actual necessities of his client. Hence, it matters not that the evidence shows, in a general way, that the contract was read and explained to the appellant, and that she expressing herself as satisfied, afterwards signed it, or rather affixed her mark to it. To support the transaction it was for the appellee to show that the instrument was executed without a speck of imposition or undue influence, and that it was the result of a well-considered, definite, and settled purpose on her part. And by undue influence in this connection is not meant an actual influence consciously and designedly exerted, but the influence which naturally springs from a confidential relation.

"The question," said Lord Eldon, in *Huguenin* v. *Baseley*, " is not whether she [the party subject to influence] knew what she was doing, had done, or proposed to do, but how the in-

tention was produced; whether all that care and providence was placed around her, as against those who advised her, which from their situation and relation with respect to her, they were bound to exert on her behalf."

That there was any independent advice in the present case can hardly be pretended. The justice of the peace, whose certificate of acknowledgment is appended to the contract, was called in, not by the appellant, but by the appellee, and was called in, as in his deposition he says he thought, merely to take her acknowledgment. He was not asked to act, and did not undertake to act, and, perhaps, was not competent to act, as her adviser, and, moreover, says he understood the contract as the appellant swears she did. The instrument is quite a long one, and perhaps somewhat obscure, which is an additional reason why independent advice should have been recommended by the appellee, especially as he had prepared the contract himself without previous consultation with the appellant. Her husband, it is true, was present when the contract was signed; but he was as ignorant as she, and no doubt quite as much in need of advice respecting a transaction of such importance.

The concluding clause of the contract, upon which much reliance was placed in the argument, is, indeed, in these words:

"The said Emily R. Thomas willingly makes this agreement and assignment, and requests the court to ratify the same, it being much less than she was willing to give, and proposed to give, during the litigation." But this, instead of removing the imputation of undue influence, is rather an additional evidence of it. *Bridgeman* v. *Green*, Wilm. 58, 71. In *Twyne's Case*, 3 Co. 81a, cited in 2 Min. Inst. 603, one of the enumerated badges of fraud in that case was this: " that the deed contains that the gift was made honestly, truly, and *bona fide*;" for, said the court, " *clausulæ inconsuetutæ semper inducunt suspicionem.*"

It is very clear, therefore, in the light of these principles,

that the contract in question cannot be upheld as "the pure, voluntary act" of the appellant's mind.

But, apart from the question of undue influence and of her understanding of the contract, did she understand the nature and extent of her rights? There is no evidence that she did, and we must, therefore, assume that she did not. The appellee, although he had been her counsel from the death of the testator, and was also the administrator of the estate, admits that he himself was not definitely informed on the subject; for in his deposition he says: "*After* she signed the contract   *   *   I told her she was the richest person in the county; that she owned more land; that the personal estate would pay all the debts, the balance on Frank Turner's legacy, all the costs of administration, including my fee as agreed on in the contract, and that I thought there would be a balance going to her of from $3,000 to $5,000; but as to that *I could not speak definitely, it was mere surmise.*"

On the other hand, the appellant contends that the balance ought to exceed $6,000, and this seems probable, although the exact amount does not appear from the record. Enough, however, does appear to show that under the contract, if sustained, the appellee's compensation would exceed $10,000.

The result, therefore, was that, as the appellant was in the dark as to the nature and extent of her rights, it was impossible for her to comprehend the scope and effect of the contract, even had she construed it as the appellant did; and for this reason also the same must be declared invalid as to her, independently of the objections to its validity already considered.

We have carefully examined the case, and are of opinion that a decision could hardly be rendered more repugnant to public policy, or one the probable consequences of which would be more mischievous than would be a decision upholding this contract under the circumstances disclosed by the record. To uphold it would be to overturn or to ignore prin-

ciples which are not only deeply rooted in the law, but which ought to be considered, if not sacred, at least immutable. In this connection we cannot do better than to quote the language of the supreme court in *Stockton* v. *Ford*, 11 How., 232, where it is said: "There are few of the business relations of life involving a higher trust 'and confidence than that of attorney and client, or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law or governed by sterner principles of morality and justice; and it is the duty of the courts to administer them in a corresponding spirit, and to be watchful and industrious to see that confidence thus reposed shall not be used to the detriment of the party bestowing it."·

We have said nothing about the trustee not being a party to the contract, because it is not necessary to the decision of the case. It is right, however, to add that there is nothing in the present case affecting the moral character of the appellee, whose only fault has been that, in dealing with the appellant, he overlooked, or did not sufficiently attend to, the rule of equity, to which we have called attention, relating to dealings between persons standing, or who have lately stood, in a confidential relation.

Then the question is, the contract being invalid, what is the proper disposition to make of the case?

The entire residuum of the estate was left by the testator in trust for the sole and separate use of the appellant for life, with power of appointment by will, and, in default of such appointment, to her heirs and next of kin. Her children, therefore, are only remotely and contingently interested, and one of them is an infant. The others, who are *sui juris*, assented to the contract, and have not appealed from the decree, although in their depositions they say they thought the contract was for five thousand dollars only, to be paid out of the principal. In cases somewhat similar to the present it has been held that although the contract cannot be upheld,

yet that it will be permitted to stand as a security for what is justly payable under an implied contract. The appellee has, confessedly, rendered valuable service, but there was no other contract for a fee than the one we have been considering. It is conceded, however, by all parties before the court that a fee of five thousand dollars would not be an extravagant one for the services rendered, although the appellee had the assistance throughout the litigation of an able attorney, Mr. Whitehead, who charged and has been paid seven hundred dollars.

We think a reasonable fee ought to be allowed for protecting the trust estate against the claims asserted against it, and that an allowance of five thousand dollars, to be paid out of the *corpus* of the estate, is reasonable and ample. The defence of the case in the circuit court involved considerable time and labor, although a stronger case for the application of the equitable doctrine relating to *laches* and stale demands could hardly be imagined. The estimates of the attorneys, who were examined as witnesses in the case on the subject of the appellee's compensation, seem to have been based on the idea of an employment on a contingent fee; but there was no such employment, nor is that a proper basis upon which to ascertain what is justly due under an implied contract.

The decree, in so far as it is in conflict with this opinion, will, therefore, be reversed, and the cause remanded for such further proceedings, not inconsistent therewith, as may be necessary in order to a final decree.

LACY, J. dissenting, said:

I do not concur in the opinion of the majority, and as my dissent goes to the construction of an important statute of this State, I will briefly explain its grounds.

The estate devised was in amount about $50,000 as the record discloses, and claims were urged against it by suit amounting to its full value or nearly so. The beneficiary under Lemuel

Turner's will was his former slave, and her whole interest under this will was in jeopardy. John T. Dillard, the executor named in the will, qualified as such in February, 1879, and while the suit of Narcissa E. Dillard was pressed against the estate of Lemuel Turner, deceased, having been brought about the time of his death, under circumstances explained fully in the late case in this court of *Turner's Adm'r* v. *Dillard*, 82 Va., p. 536, nothing was done to defend the estate against demands which went to its full value. The appellant in this case, who was entitled to the estate which should remain after the payment of its debts, *understood her interests sufficiently well then* to seek out the appellee, the Hon. Thomas P. Fitzpatrick, an able and successful lawyer of the county, and solicit his professional services in her behalf.

She was without money to pay fees, and whatever compensation her counsel should receive, if he undertook to serve, must necessarily be wholly contingent, and while she was not able to pay him *anything* in advance, she offered and agreed to pay him, in the event of a successful issue, all of the estate except the "Bob Creek" farm upon which she lived. That she so agreed is proved by the appellee in the record and admitted by her.

The appellee, for reasons not appearing in the record, succeeded in having Dillard removed as executor, and procured the appointment of himself as administrator *de bonis non*. The work of defending this estate from the assaults of the disappointed relatives of the testator, who was a bachelor, then commenced in earnest, with the assistance of other able counsel, and was so far successful, that recoveries were defeated as to all of these claims, except $18,000, for which decree was rendered by the circuit court of Nelson county. But the appellee appealed to this court, where the said appellant was completely successful, and the suit of the Dillards was dismissed for reasons stated in the case of *Turner's Adm'r* v. *Dillard, supra.*

The litigation being now ended, the appellee called upon her, the appellant, not to comply with her original agreement before the work began, but took from her a very much smaller assessment, as is set forth in the opinion of the majority in full. This she readily and cheerfully agreed to do, and expressed her thanks and gratitude that the appellant, her counsel, had been so liberal with her.

Camp, the witness, does say that he understood the fee was to be $5,000, but he also says that he paid very little attention to the details of the matter, and that he did not charge his memory with it. But he also says:

"The contract (set forth in full in opinion of majority) was then read in the presence and hearing of all in the room; at the end of nearly every paragraph Captain Fitzpatrick would make an explanation, so that it might be clearly understood. After W. C. Fitzpatrick (the son of appellee) finished reading the article, Emily Thomas expressed herself perfectly satisfied, and thought, taking everything into consideration, Captain Fitzpatrick's fee was reasonable enough, and *signed and acknowledged the same* in my presence, and I, as a justice of the peace, certified the same." He further says the appellee "showed every disposition to make the matter perfectly clear to her—frequently, while it was being read to her, would have the reading stopped and he would explain to her, and he seemed very desirous that she should understand every part of the contract before signing the same."

And further, that he had known the appellant from her birth, and that he had always considered her a person of *good mind.*

Now, here we have a contract entered into freely and voluntarily after full explanation, by a person of good mind and understanding, for a valuable consideration. And this was acquiesced in until, applying to her trustee for money, the appellant was refused any payment, because the interest up to 1890 had been assigned to her said counsel; and she then and

subsequently declared that she did not understand the contract she had made.

This contract was enforced by the learned judge of the circuit court, but by the opinion of the majority it is set aside.

Because by an "equitable and wisely-established rule which applies to such cases," "all dealings between attorney and client, for the benefit of the former, are not only *regarded with jealousy*, and closely scrutinized, but *they are presumptively invalid on the ground of constructive fraud*, and that presumption can be *overcome only by the clearest and most satisfactory evidence.*"

My opinion is that *there is no such rule established in Virginia*, whether it be *equitable* or *inequitable*, *wise* or *unwise*.

But that by the mandate of express statute, an attorney at law is entitled to the benefit of his contract with his client for his fee, exactly like any other person claiming under any contract is entitled to the benefit of his contract, which is honestly and fairly entered into, without deceit or fraud.

And that no other nor greater burden is placed upon an attorney contracting with his client by the law than is placed on any and all persons making contracts.

Here is the law in our Code upon the subject of attorney's fees:

(Section 11, chapter 160, Code of 1873), in force at the time this contract was made.

"An attorney shall be entitled as a fee to the amount which the clerk is authorized to tax in the bill of costs in any suit or for any service as such attorney.

"*But* ANY CONTRACT *made* WITH AN ATTORNEY FOR OTHER OR HIGHER FEES SHALL BE VALID, AND MAY BE ENFORCED IN LIKE MANNER WITH ANY OTHER CONTRACT."

Now, what does this mean? Any contract with an attorney! To be enforced in like manner with any other contract.

We are told in the opinion that all dealings between attorney and client, for the benefit of the former, are *presumptively invalid on the ground of constructive fraud.*

A contract for other and higher fees is certainly one for the benefit of the attorney, but the law says that shall be valid, and that it shall be enforced in like manner with other contracts.

This statute is still the law in Virginia; it was somewhat amended in the report of the revisors. Chapter 155, section 3239, page 736, of the printed report of the revisors to the legislature, and was adopted as proposed by those gentlemen by the legislature.

It is now as follows:

"Sec. 3201. Attorney's fee.—An attorney shall be entitled as a fee to the amount which the clerk is authorized to tax in the bill of costs in any suit or for any service as such attorney.

"But any contract made with an attorney for *higher compensation* shall be valid, and he may recover such sum as he contracts for from the party for whom the service is rendered; and if there be no such contract, he may recover from such party what his services are reasonably worth."

Code of Virginia, section 3201, in force May 1st, 1888.

Then I may ask, where does this supposed "equitable and wisely established rule" stand in this State?

The legislature is our law-making power.

"The legislative power of this Commonwealth shall be vested in a general assembly, which shall consist of a senate and house of delegates." Constitution of Virginia, Article 5, section 1.

It is not in the power of this court to set up any rule, however wise, in plain contravention of a statute.

But, says the opinion, this statute applies to contracts made before the relation of attorney and client began.

The authority for this limitation upon this statute is not given; the statute does not so limit itself. The statute says *any contract made* with *an attorney* for other and higher fees. That is, by a client, for *clients* are the persons who contract to pay fees.

And the statute is express that this contract shall be en-forced in like manner with any other contract; that is, it is to bear no other burden than such as is borne by any other contract. I might well stop here and consider my task as finished; but as this statute has recently been under consid-eration in this court as at present constituted, and as the opinion in that case was unanimous, I will cite it.

In the case of *Yates and Ayers* v. *Robertson and Berkeley*, 80 Va. R., p. 475, this court, referring to this statute (chapter 160, section 11, of the Code of 1873, *supra*) said:

"The ground of this exception is that, by section 11, chapter 160, of the Code of 1873, the fee of an attorney is fixed and limited to the amount which the clerk is authorized to tax in the bill of costs in any suit; and that by section 13, of chapter 181 of the Code, such fee in this cause so authorized to be taxed is two dollars and fifty cents. Section 11, chapter 160, *supra*, does provide for such a fee, but the section further provides: "But any contract made with an attorney for other or higher fees shall be valid, and may be enforced in like manner with any other contract."

Under the 14th and 15th sections of chapter 76, of the Code of 1819, volume first, the lawyers of the Commonwealth were limited to fees provided for in the said 14th section, the 15th section providing that no lawyer in any suit to be brought for his fees or services, shall recover more than the fees so pro-vided, notwithstanding any agreement, contract, or obligation entered into by the party against whom such suit shall be brought, retaining from the older acts of 1761, chapter 3, sections 11 and 12, of edition of 1769, and chapter 71, section 12, of editions of 1794, 1803, and 1814 the provision: "If such agreement, contract, or obligation shall have been entered into before the suit or suits in which such fees shall have accrued, or services been rendered, were finally determined," which provisions were in force from January 1st, 1820.

The legislature, however, January 2, 1840, repealed this pro-

vision of the law and enacted the provision cited *supra* as part of section 11, chapter 160, of the Code.

"But any contract made with an attorney for other or higher fees shall be valid, and may be enforced in like manner with any other contract"; which provision appears in the Code of 1849, and is the law, as we have seen, in the present Code.

In arriving at the true construction to be given to this provision of the law, as found in 11th section of chapter 160, we may observe the striking contrast between the severe restriction to be found in the 15th section, of chapter 76, of the Code of 1819, and the entire absence of all restriction in the present law.

The policy of the law as to the lawyers appears to be *entirely* changed, and they are left free to conduct their business *transactions with their fellow men upon the same basis as other citizens;* they and those dealing with them to be mutually bound by their contracts, express or implied.

Mr. Minor, speaking upon this subject, says: "In respect to the compensation of attorneys, the policy so long and so vainly persisted in of prescribing and limiting their fees was abandoned at the revisal of 1849, so that since that period an attorney may make any contract for fees with his client and it will be valid, and may be enforced like other contracts" (citing section 11, chapter 160, Code 1873, *supra*).

"Nor does it seem to be material whether the contract is *express* or *implied,* so that if no contract be proved, the attorney will be entitled to receive a fair and adequate compensation for his services. It should be observed, however, that the clerk is not authorized to tax against the losing party any other attorney's fee (whatever the successful adversary may have actually paid) than the very inconsiderable sum prescribed by law, in most cases not to exceed $2.50 in a court of law," &c. 4 Min. Inst., 477.

And it may be further said, that this is taxed only on one

side, to be paid to the winning side, and nothing is provided as to the attorney's fee on the other side.

Under the construction contended for by the plaintiffs in error, what is the fee to be paid to the attorney on the losing side? The law makes no provision for it whatever; it is left to depend upon contract. And this fee, fixed and provided in the statute, is intended for cost, to recompense the party to the cause for his outlay, &c., and is in no wise intended by the law makers to limit the fee of a lawyer as between him and his client, *which is* expressly left to depend upon contract between the parties which, like contracts growing up in the transactions of other citizens of the Commonwealth, *may be either express or implied.*"

The legislature responded to this interpretation of its statute, by amending the law in accordance with our construction of the same, so as to make it so plain that nothing should hereafter be left to construction, and the statute as we have seen is extended by express words to cover the case of an implied contract, and the foregoing case is cited in the margin by the code makers. The decision now in hand, as I understand it, sets back the law fifty years, and goes behind the statute of 1840, *supra*. And if a decision of this court can amend or alter a statute, then the statute I have been considering has ceased to exist. But I do not consider that the decision of any case can have that effect, except so far as the case in hand is concerned, and the law is still in force for the future. But in this case I may remark that in my opinion the appellee has suffered a diminution of his just rights. His contract with his client is overturned because it was with his client, and although the client, who was a person of good sense, surrounded and advised by her natural protectors, her husband and her adult sons, deliberately and consciously made, because her counsel agreed not to let her sign it until she said she understood it. She has succeeded in having it set aside upon her subsequent declaration that she did not understand it, aided by

certain supposed presumptions of the law, which have no existence in this State, and have not had for fifty years.

Upon the question as to what the fee should reasonably have been upon the principles of a just compensation for services rendered, Judge Brown testifies that the demands defeated by Judge Fitzpatrick would have swallowed up the whole Turner estate if they had been allowed, and that under the contract the fee would not have exceeded $8,000; and says further, "I feel no hesitation in saying that the contract is in all respects a reasonable one, and should be approved by the court."

Mr. Caskie, a well-known and able lawyer of that bar, testifies that claims against the estate of Turner would have aggregated $80,000 if successful, and says: "I should certainly regard $5,000 as an inadequate fee by itself, and that one-third of the sum which the court of appeals reduced the decree of the circuit court, would be exceedingly reasonable."

Mr. W. M. Cabell, another prominent lawyer and citizen of that county, testifies that the bulk of Turner's estate would have been swept by the defeated claims, and says that $5,000 out of the principal of the estate should be paid appellant in addition to the assignment out of the interest (and so also said Mr. Caskie above mentioned), and that the contract is reasonable and should be enforced.

Mr. R. M. Brown, the counsel who brought the original Dillard suit, says: "The case required great labor on the part of counsel, both in court in the argument, and out of court in taking depositions, and these duties were assiduously performed by Judge Fitzpatrick, and elaborately with eminent skill and ability, and that $8,000 would be reasonable and fair." That is a contingent fee to him of one-fifth of $40,000 in order as he succeeded in wholly defeating claims fully to that amount.

The late Hon. Ro. A. Coghill, a lawyer of extensive practice and wide fame in Virginia, and counsel for the Dillards, testifies as follows: "The case was well managed, there

is no doubt about that, and it required very great labor, and was properly defended. I think, taking all the circumstances together, his fee was contingent after all, because if the pretensions of the parties had prevailed it would have swept the whole estate, and I think $8,000 or $10,000 would be a reasonable fee."

The matter was considered by Commissioner Cabell, and he reported in favor of the fee contracted for, and the circuit court decreed in support of the contract. Let us enquire who fixed the fee of $5,000 as a proper fee in the evidence?

The answer is, Emily R. Thomas, the appellant, Reed Thomas, Callie Thomas, Charlotte Thomas, her adult children, who, like herself, had agreed to and had signed the contract, as did her husband also.

M. K. Estes, the trustee, said that Emily Thomas told him she thought the contract was for $5,000.

I do not consider that there was any ground to be found in the evidence to justify the upsetting of this fair and just agreement. Numerous witnesses of the finest intelligence and highest character, fully conversant with all the circumstances, say that the contract is just and fair, and should be enforced, while Emily Thomas and her adult children, after executing the contract in the fullest light of explanation, deny their responsibility when called on to comply with their just agreement, and fix the fee at $5,000, and this is *all the evidence* to assail the contract or to establish $5,000 the proper amount of the fee, so I dissent upon the merits as well as upon the law of the case as set forth in the opinion of the majority.

DECREE REVERSED.