# Richmond.

## BRUCE'S Ex'x. V. BIBB'S Ex'x.

January 20, 1921.

Absent, Sims, J.

1. ATTORNEY AND CLIENT—*Transactions Between Attorney and Client Closely Scrutinized.*—While before the relation commences, counsel and client may freely make their contracts, subject to the same rules as those which govern other men, still after the relation commences it is regarded as one of special trust and confidence. All dealings between the attorney and client must be characterized by the utmost fairness and good faith, and transactions between them are closely scrutinized.

2. ATTORNEY AND CLIENT.—*Transactions Between Attorney and Client—Rule Not Inflexible—Death of Attorney.*—Generally transactions between attorney and client are regarded as *prima facie* fraudulent, and where the transaction is of advantage to the attorney, he is required to show, not only that he exercised no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been if the client had been dealing with a stranger. This rule, however, is not inflexible, and in those cases where, owing to the death of the attorney, it is impossible for his representatives to make full or plenary proof, it is not always rigorously applied.

3. ATTORNEY AND CLIENT.—*Transactions Between Attorney and Client—Whether Voidable.*—While some cases have held that all such transactions are voidable at the election of the client, the better rule, and the one established by the preponderance of authority, does not go so far. Although such transactions will be closely and carefully scrutinized, yet those which are obviously fair and just will be upheld, and the client is not entitled to absolute relief from such a contract, unless it be

shown that he has suffered some injury through an abuse of confidence on the part of his attorney.

4.  ATTORNEY AND CLIENT.—*Transactions Between Attorney and Client—Case at Bar.*—In the instant case, a suit by the executrix of a deceased client against the executrix of a deceased attorney to have a bond given by the client to the attorney for legal services cancelled, the contract embodied in the bond under the established rules as to transactions between attorney and client was held voidable, not because any actual fraud could be fairly inferred from the evidence, but because, under the scrutiny which a court of equity must give to · such contracts, it appeared that it provided for compensation to the attorney in excess of the fair value of the services which were shown to have been rendered. It also appeared that the bond, equal to one-third or one-fourth of the client's entire estate, was relatively too large a proportion of his property to be paid to his attorney for such legal services, in the absence of clear and convincing evidence of the character and value of those services justifying such a fee.

5.  ATTORNEY AND CLIENT.—*Transactions Between Attorney and Client—Allowance of Reasonable Compensation Upon Refusal to Enforce Contract.*—In a suit by the executrix of a deceased client against the executrix of a deceased attorney to have a bond given by the client to the attorney for legal services cancelled, where it appears to the court that the bond itself could not be enforced, but it was clear that in equity and good conscience the attorney's estate was entitled to a substantial recovery for a general retainer and services rendered, the court will allow reasonable compensation; and legal services rendered by the deceased attorney's son because of his father's contract, the son having assigned to his father's estate any claims which he would otherwise have had for such services, may be considered in determining the amount for which the client's estate should be held liable.

6.  ATTORNEY AND CLIENT.—*Transactions Between Attorney and Client—Laches.*—Suit was instituted by the executrix of a client to have a bond given by the client to his attorney for legal services canceled nearly five years after the date of the bond. The client lived for three years after the death of the attorney, and during that period accepted legal advice and services from the attorney's son without paying any compensation therefor; and when the bond was shown to him by the attorney's executrix, he demanded and received a credit of $500 thereon.

*Held:* That complainant was not barred from repudiating the

bond by the laches of her testator. While these circumstances made a strong case for defendant, they were not sufficient to overcome the principle that transactions between attorney and client should be given the closest scrutiny.

7. ATTORNEY AND CLIENT.—*Reasonableness of Fees.*—There is no standard of legal fees which can be confidently appealed to. The amount appears to depend upon the circumstances of each case, among them the ability and standing of the attorney, and in case of a general retainer, the business which he cannot accept, the value of the services to the client, and the other special circumstances which mark each instance of the employment of an attorney by a client.

Appeal from a decree of the Circuit Court of Louisa county. Decree for defendant. Complainant appeals.

*Amended and affirmed.*

The opinion states the case.

*Gordon, Gordon & Mitchell,* for the appellant.

*Shackelford & Robertson,* for the appellee.

PRENTIS, J., delivered the opinion of the court.

This is an appeal from a decree refusing to cancel a bond executed by R. L. Bruce to W. E. Bibb. The bill prayed for an injunction against the collection of the bond, but the decree held it valid and established it as a debt against the estate of Bruce, subject, however, to a credit of $500.

The bond reads thus: "Whereas W. E. Bibb has been my counsel for many years, and I am legally indebted to him for service, and for money advanced me from time to time, in considerable amount, and whereas he has agreed to accept at my death the sum of five thousand dollars in consideration of what I now owe him, and also to render such other legal services as may be needed until my death.

I do hereby bind myself and estate to pay him at my death without interest the sum of five thousand dollars.

"Witness my hand and seal this 31st day of March, 1909.

(Signed)    R. L. BRUCE.    (Seal)."

Bibb was an attorney of Louisa county, Virginia, where he had practiced law for many years. The estimation in which he was held by those who knew him best is indicated by the fact that he was attorney for the Commonwealth for Louisa county for several terms, that he represented his district in the State Senate of Virginia for one term, that he was actively engaged in the practice of law during nearly all of his manhood, and at the time of his death was assistant Attorney General of Virginia, to which office he had been appointed a short time before his death, which occurred December 10, 1910. Bruce, who was also a resident of Louisa county and lived until about December, 1913, had been his client for many years, and they occupied this relation at the time of the execution of this bond. They had been warm personal friends for years and Bruce was then unmarried. Bruce married a young woman a short time before his death, and thereupon revoked his previous will, (which had been drawn by Bibb on the same day the bond was executed) and gave almost his entire estate to his wife, subject to his debts, whereas by the former will he had given it to one of his nieces, subject to his outstanding obligations.

The pleadings are voluminous, but it is not necessary to recite their allegations in detail. The amended bill of the complainant and the answer thereto and cross-bill of the defendant sufficiently present the controlling issues to be determined in this case.

It is claimed for the appellant that the transaction thus indicated between this attorney and his life-long client, while these confidential relations existed, is actually and

constructively fraudulent, and therefore invalid in every respect.

The legal doctrines applicable under such circumstances have been so frequently announced that we deem it unnecessary to follow counsel in their full citation of authorities. There have been two cases in Virginia to which our attention has been directed.   One of these is *Thomas* v. *Turner's Adm's*, 87 Va. 1, 12 S. E. 149, 668, which has been often cited and may be regarded as a leading case on the subject. Lewis, P., in that case, carefully considered the question and cited many authorities to support the conclusions reached, saying among other things: "It is the duty of an attorney to give to his client the benefit of his best judgment, advice, and exertions, and it would be a just reproach to the law if he were permitted to bring his own personal interest into conflict with that duty by securing a benefit to himself through the influence which the relation implies.   All transactions between the parties, to be upheld in a court of equity must be *uberrima fides,* and the *onus* is on the attorney to show, not only that no undue influence was used, or advantage taken, but that he gave his client all the information and advice as against himself that was necessary to enable him to act understandingly. He must show, in other words, (1) that the transaction was perfectly fair; (2) that it was entered into by the client freely; and (3) that it was entered into with such a full understanding of the nature and extent of his rights as to enable the client to thoroughly comprehend the scope and effect of it.   Or, as Lord Eldon tersely puts it in the famous case of *Huguenin* v. *Basely*, 14 Ves. 273, the transaction must be shown to have been the 'pure, voluntary, and well-understood act' of the client's mind, otherwise a court of equity will undo it, as having been unduly obtained."

The other Virginia case is *Cullop* v. *Leonard*, 97 Va. 259, 33 S. E. 612, in which Keith, P., said: "The client was, as

7

we have said, an old and ignorant woman, wholly unacquainted with the conduct of affairs, as is abundantly shown by this record, and, under such circumstances,. there can be no doubt that it is the duty of a court of equity to scrutinize with jealous care transactions between such a client and her attorneys, and see that no oppression is exercised, and no advantage taken of her necessities and inexperience. *Thomas* v. *Turner,* 87 Va. 1, 12 S. E. 149, 668; *Huguenin* v. *Basely,* 1 Leading Cases in Equity (Part 2), p. 1216, *et seq;* Bigelow on Fraud, p. 192, sec. 2; Pomeroy's Eq. Jur., sec. 960 and notes."

[1-3]    It should be noted in passing that in both of these cases the client was an ignorant woman, incapable of protecting her own interests, whereas the record in the case in judgment shows that Bruce was an intelligent man, though of a· litigious character and apparently in full possession of all his faculties, perfectly familiar with proceedings in court because of his years of experience as a litigant, jealous of his legal rights, energetic, thrifty, and fully able to take care of himself in a bargain.   The rule in Virginia does not differ from that generally applied. While it is true that before the relation commences counsel and client may freely make their contracts, subject to the same rules as those which govern other men, still after the relation commences it is regarded as one of special trust and confidence. All dealings between the attorney and client must be characterized by the utmost fairness and good faith, and transactions between them are closely scrutinized.   There are cases in which such· transactions have been held to be *prima facie* fraudulent, and where it is of advantage to the attor-· ney, he is required to show not only that he exercised no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been if the client had been dealing with a stranger. This rule,

however, is not inflexible, and in those cases where owing to the death of the attorney it is impossible for his representatives to make full or plenary proof, it is not always rigorously applied. While some cases have held that all such transactions are voidable at the election of the client, the better rule and the one established by the preponderance of authority does not go so far. Although such transactions will be closely and carefully scrutinized, yet those which are obviously fair and just will be upheld, and the client is not entitled to absolute relief from such a contract, unless it be shown that he has suffered some injury through an abuse of confidence on the part of his attorney. 6 C. J. 686.

There is a comprehensive note on the subject to the case of *Shirk* v. *Neible* (156 Ind. 66, 59 N. E. 281), 83 Am. St. Rep. 159, and the later cases on the subject are cited in the notes found in 116 Am. St. Rep. 498, 140 Am. St. Rep. 750, and 2 R. C. L. 1036-1046.

[4] Tested by the established rules which, while they may sometimes operate harshly in particular cases, are nevertheless based upon sound public policy, approved by high-minded members of the profession, and operate for the benefit of the bar as well as for the protection of the public, the contract under consideration in this case must be held voidable. This is not because any actual fraud can be fairly inferred from the evidence in the record, but because under the scrutiny which a court of equity must give to such contracts, it appears that it provided for compensation to the attorney in excess of the fair value of the services which are shown to have been rendered. These services, however, previous to the time when the bond was executed, had been numerous and troublesome, for Bruce was in frequent disagreement and litigation with his neighbors, either before justices of the peace on warrants for small claims, or before the courts of record. Once theretofore he

had been indicted for a felony, being charged with shooting with intent to maim, disfigure, disable or kill; and once before the execution of the bond as well as once afterwards, he had been indicted for violation of the law prohibiting the sale of intoxicating liquors, and was convicted thereof on several counts in both prosecutions. He had a good farm, and the complainant alleges that his entire estate is worth about $15,000, whereas the defendant alleges that the value of his real and personal property exceeds $20,000. In either event, the bond for $5,000, equal to one-third or one-fourth of his entire estate, was relatively too large a proportion of his property to be paid to his attorney for such legal services, in the absence of clear and convincing evidence of the character and value of those services justifying such a fee. The books of the attorney were not well or accurately kept, but the testimony indicates that while settlements between them were infrequent, difficult partial and unsatisfactory, at the same time it may be inferred therefrom that exclusive of such amount as might then be due on account of the general retainer and for advice, the actual amount due at the date of the bond for fees indicated by the accounts produced was about $200. The evidence relating to other indebtedness is also uncertain and unconvincing, though it is clear that there were other transactions involving indebtedness from one to the other. Because of the death of both and the consequent loss of proof, we can only speculate as to the actual facts.

[5] In both of the Virginia cases hereinbefore cited, while the court refused to enforce the contract, it allowed or authorized the allowance of compensation adjudged by the court to be reasonable, based upon the value of the services rendered. So, in this case, while we think that the contract itself cannot be enforced, it is clear that in equity and good conscience Bibb's estate is entitled to a substantial recovery both for the retainer and the value of the services

rendered. It is noted that the contract embodied a contract for future services, and it sufficiently appears from the record that thereafter and up to the time of his death Bibb performed it faithfully. It also appears that after his death his son, W. C. Bibb, who is a reputable practicing attorney but was not a party to the original contract, continued to render legal services to Bruce under the contract, apparently with Bruce's knowledge and acquiescence, for he paid him nothing, and that after Bruce's death he refused employment as an attorney against his estate because he felt that it would be unprofessional, or at least unethical for him to accept employment against the estate of a client with whom he and his father had been so intimately associated professionally, and that at the time of the second prosecution for the illicit sale of liquor he was attorney for the Commonwealth and hence he prosecuted Bruce, who (upon Bibb's recommendation) employed another attorney to defend him, to whom he paid a fee of $500. While the younger Bibb was no party to the original contract with his father, and claimed no interest thereunder, the fact that he thus, with Bruce's acquiescence, continued to render him legal services because of that contract, and that he has assigned to his father's estate any claims which he would otherwise have for these services, should in fairness be considered in determining the gross amount for which Bruce's estate should be held liable.

[6] Among the claims made by Bibb's executrix to sustain the decree of the trial court is, that the complainant is barred from repudiating his bond by the laches and acquiescence of her testator. There is much force in this contention, and authorities may be cited in which such a defense has been sustained under the peculiar circumstances of those cases.

The circumstances relied on here to show laches and ratification of the contract are these: That this suit was not

instituted until nearly five years after the date of the bond: that Bruce lived for three years after the death of Bibb and during that period accepted the younger Bibb's legal advice and services without paying any compensation therefor; that when the bond was shown to him by Bibb's executrix, he demanded and received a credit of $500 thereon on account of Bibb's admitted indebtedness to him. On the contrary, there is testimony to the effect that he said to one witness (but never to either Mrs. Bibb or to the younger Bibb) that "he thought he was having his will made; that he had implicit confidence in anything Mr. Bibb did for him, and that he did not look over the papers he signed; that he thought he was writing a will for him;" and there is also testimony that he expressed to this witness and to another surprise at the existence of such a bond. This testimony, however, even if admissible, is not impressive as showing actual fraud and deceit, because his actions speak so much louder than his words, for he accepted the services of the younger Bibb, and he never instituted any suit or in any other manner indicated any intention to seek relief from the obligation of the bond, which was shown to him by Bibb's executrix, and which he read at least two years before his death. These circumstances make a strong case for the appellee, and probably influenced the trial court, but so important is it alike for the interest of the public and of the profession to maintain the salutary principle which is involved, that we think they are insufficient to support the entire decree.

[7]    As we have reached the conclusion that the bond cannot be specifically enforced as a contract, we must determine the fair value of the retainer and the services rendered by these attorneys to Bruce, taking all of the circumstances into consideration.    That substantial services were rendered Bruce on the faith of the contract, both before and after Bibb's death, is perfectly clear from the record, and that no adequate compensation has been paid

therefor is equally apparent. It is unfortunate that there is no standard of legal fees which can be confidently appealed to. The amount appears to depend upon the circumstances of each case, among them the ability and standing of the attorney, the business which he cannot accept if his services are retained in advance, as was the case here, the value of the services to the client, and the other special circumstances which mark each instance of such employment. He must determine, as a matter of equity and good conscience (for the complainant who is seeking the intervention of an equity court must herself do equity), the amount which is fairly due by the estate of Bruce to the estate of Bibb.

Giving then the facts of this case our best attention, we conclude that a fee of $2,000 (in addition to the $500 already paid), with interest from December 31, 1913, the approximate date of Bruce's death, would be such fair allowance. We will, therefore, amend the decree complained of so as to include such a judgment as a full and final settlement of this controversy, and affirm the decree complained of thus amended. As the appellant substantially prevails in this court, costs will be awarded against the appellee.

*Amended and affirmed.*