GOODE *v.* KING.

4-3528

Opinion delivered November 19, 1934.

*W. A. Jackson* and *Beloate & Beloate,* for appellants.

*D. L. King, R. C. Waldron* and *J. H. Townsend,* for appellee.

SMITH, J. Richard M. Moore owned at the time of his death a farm known as the old Marshall farm, situated on the right bank of Spring River in Lawrence County. He was survived by his widow, Mrs. M. C. Moore, and three sons, whose initials were N. R., J. C. and B. M. Moore, respectively. After the death of his father, N. R. Moore borrowed $1,500 from J. S. Pruitt, and gave Pruitt a note for that amount, which was signed by N. R. Moore and Pearl Moore, his wife. This note created a lien upon the maker's interest in his father's farm. Pruitt, the payee named in the note, died, and Wells, his administrator, brought suit to enforce the lien there granted in payment of the note. The Bank of Ravenden and J. C. and B. M. Moore, the two brothers of the maker of the note, filed an intervention in this suit, and also a demurrer to the original complaint, which was sustained, but upon an appeal to this court it was held that the demurrer should have been overruled, and the decree of the lower court was reversed, and the cause was remanded with directions to overrule the demurrer.

See *Wells v. Moore,* 163 Ark. 542, 260 S. W. 411. No directions were given upon the reversal and remand of the cause except to overrule the demurrer, and the present appeal arose out of subsequent proceedings.

In this intervention filed by the bank and J. C. and B. M. Moore, it was alleged that N. R. Moore, while acting as cashier of the bank, had been found short in his accounts with the bank to the admitted extent of $3,750, and to make the shortage good N. R. Moore had conveyed his interest in the lands which he had inherited from his father to his brothers, J. C. and B. M. Moore, who assumed the payment of the shortage, and, by way of security therefor, mortgaged to the bank the interests which they had inherited and also the interest which they had acquired in the deed from their brother, N. R. Moore. It was not then certain that the full amount of N. R. Moore's shortage had been determined, and the mortgage was drawn to cover any other shortage which might later be discovered, and it was subsequently determined that the total shortage approximated $7,000.

J. C. Moore died and was survived by four minor children and by his widow, Mary Ellen Moore, who subsequently married Charles Goode, and she is referred to throughout the record and in the briefs as Mrs. Goode. The widow of Richard M. Moore, who had joined in the execution of the mortgage to the bank to secure the payment of the shortage of her son, N. R. Moore, was made a party defendant to the cross-complaint which the bank filed along with its intervention to foreclose the mortgage against her and against her surviving sons, N. R. and B. M. Moore, and against the widow and minor heirs of J. C. Moore. These cross-defendants were all properly served with process upon the filing of the cross-complaint, and D. L. King was employed as an attorney to represent the cross-defendants.

Without tracing the progress of that litigation, it may be said that it eventuated in a decree ascertaining and adjudging the amount of N. R. Moore's shortage to the bank, and directing the foreclosure of the mortgage given to secure its payment.

Much of the testimony contained in the record now before us was devoted to an attempt to show that King had been unfaithful to his clients and had conspired with the bank and its representatives to improperly present certain defenses which could and should have been offered in the foreclosure suit. These were, first, that the execution of the mortgage had been secured through coercion by threats to send N. R. Moore to the penitentiary if it were not .executed, and that the mortgage was finally executed for the purpose of compounding a felony, and that, through and in consideration of the execution of the mortgage, a felony was compounded, and N. R. Moore was not prosecuted for his crime as he would otherwise have been. The second defense which it is insisted King should have made—but did not make—is that there were certain credits to which N. R. Moore was entitled and which would have been allowed, had they been properly asserted.

We will not review the testimony on these issues of fact, but are content to say that the testimony utterly fails to establish either contention.

After the rendition of the decree, and subsequent to the sale thereunder, an attempt was made, which appears to have been in the utmost good faith, to borrow the money to pay the judgment rendered in the decree of foreclosure. It may be said that a settlement had been made of the original suit brought by Wells, administrator, to foreclose the lien created by the note from N. R. Moore to Pruitt. The terms and details of that settlement are not disclosed, but we regard this as unimportant. The fact remains that an apparently valid decree has been rendered, in which all interested persons had been made parties, upon proper and sufficient service, including the four minor children of J. C. Moore. This decree determined the sums secured by the mortgage and ordered its foreclosure. It was rendered June 24, 1925, and pursuant to its provisions the land described in the mortgage was ordered sold, and it was advertised to be sold on October 24, 1925. In the meantime futile efforts were being made to borrow the money to pay the judgment. These failing, King personally agreed to pay

the judgment, and he took an assignment thereof to himself as security for the loan which he proposed to make. The fact is established beyond the possibility of doubt that King advanced from his personal funds the money for this purpose, six thousand dollars of which were derived from the sale of Government bonds which he then owned. The debt secured by the mortgage bore interest at the rate of ten per cent., as did also the judgment. King actually advanced $8,986.25 in cash, which he paid to the bank, and at the time of payment took an assignment from the bank of its judgment for the debt and of the decree declaring the lien and ordering its foreclosure. It is equally certain that at that time King had no intention of acquiring the title to the land, and made the advance for the benefit of his clients and at their request.

The sale as advertised was not held, but was indefinitely postponed, and the sale which was later had under the decree of foreclosure did not occur until December 18, 1926. During this interval the attempts to finance the proposition were continued, but it was found that an inaccurate description of the land in the mortgage, which had been carried forward into the decree, was an objection which rendered this more difficult. It was shown that in the preparation of the mortgage the land described had been copied from a tax receipt, which was supposed to embrace all the lands comprising the Moore farm, and which included also forty acres, a part of the farm, which Mrs. M. C. Moore, the mother of N. R. Moore, and the widow of Richard M. Moore, owned individually, and which was therefore not conveyed by the deed from N. R. Moore to his brothers, J. C. and B. M. Moore. Much testimony was offered to the effect that this forty-acre tract, although a part of the Moore farm, had been fraudulently included in the mortgage to the bank in the execution of which Mrs. M. C. Moore had joined. There are two answers to this contention. The first is that the testimony does not show any fraud or deception or mistake in the inclusion of Mrs. M. C. Moore's own individual forty acres in the mortgage. The second is that the question is concluded by the decree

of foreclosure to which she had properly been made a party.

It was thought advisable and necessary, and to the interest of all parties to correct the description of the land as it appeared in the decree, and a petition was filed in the court which rendered it for that purpose. This petition appears to have been supported by the affidavits of N. R. Moore and B. M. Moore and Mrs. M. C. Moore, their mother, which were made on March 30, 1926, which was three weeks prior to the rendition of the decree of correction made pursuant to the prayer of their petition. This petition recites that when, on January 30, 1922, the Moores executed the mortgage to the bank, ''they agreed with the said Bank of Ravenden to execute said mortgage covering all the lands owned or in which any of the parties grantor of said mortgage had an interest lying in sections 6 and 7, township 18 north, range 2 west, known as the Moore lands, should be according to said agreement and ought to have been embraced and covered in said mortgage.

The decree correcting the description contains the following recital as to the appearance of the parties:

''Now on this day, this cause being reached on regular call of the docket, comes the petitioner, David L. King, in person, and also come N. R. Moore, P. G. Moore, his wife, M. C. Moore, Ellen Moore, widow of J. C. Moore, deceased, in person, and also Ellen Moore as guardian and curator of James Franklin Moore, Mary Catherine Moore, Johnnie Ellen Moore and Louise Moore, minors and heirs at law of J. C. Moore, deceased, regularly appointed by the probate court of the Western District of Lawrence County and acting as such guardian and curator.

''And the court further finds that at this time all parties in any way interested in the subject-matter of this action are all before the court in person, and being duly represented by attorney and guardians as required by law.''

Concerning the error in the description the decree contains the following recital:

"It is shown to the court here at this time from the oral testimony of Ellen Moore and L. B. Poindexter, taken in open court, and the depositions of Mahala C. Moore, B. M. Moore and N. R. Moore, that there is a defect and misdescription of the lands in the original mortgage executed to the Bank of Ravenden."

The testimony in the record before us makes clear the fact that there was an erroneous description, and that the decree as corrected now accurately describes the land which the mortgage was intended to cover. The increase in acreage under the corrected decree was less than an acre more than that described in the original decree, and this increase resulted from the fact that some of the tracts of land there described did not contain an even and exact number of acres but some contained the fractional part of an acre.

It is very earnestly insisted that this correction decree is void for the reason that it appears, from the face thereof, that it was rendered at a term of court subsequent to the rendition of the original decree of foreclosure, and was done without service of process upon the minor defendants, and without the appointment of a guardian *ad litem* to represent them for the purpose of requiring the showing to be made that the amendment was not to their detriment but was to their advantage. It is stated also that the petitions and affidavits of the Moores were a forgery of their names by N. R. Moore, but this contention does not appear to have been made until long after the death of N. R. Moore, and was not sustained by the evidence.

It does appear that this decree was rendered without service of notice of the filing of the petition; but it will also be noted that this petition was not filed against the minors, but was filed for them along with the other Moore heirs in the case in which they were all parties, made so by proper service of process, and the recitals of the decree indicate that the court made inquiry into and a finding upon the petition of their guardian and others that the correction of the description was a proper order to make, and not prejudicial to the minors to make under the circumstances. The power of the court to correct

such an error in a proper case has been adjudged in many cases.

The lands were first advertised to be sold on October 24, 1925, but, pending the efforts to refinance the loan and to correct the description as a means to that end, the sale did not actually occur until December 18, 1926, at which time a sale of all the lands was made to W. A. Bowman, who was Mrs. Goode's uncle. At that time neither N. R. Moore nor Mrs. M. C. Moore had any interest in the lands, as they had conveyed their interests to J. C. and B. M. Moore, who had executed the mortgage to the bank which had been ordered foreclosed under the decree of the chancery court. Bowman was unable to pay the purchase-money note which he gave to the commissioner making the sale, and to avoid another sale it was agreed that Bowman should convey the land to Dr. E. N. F. Sullivan, who should convey to King, who would accept the conveyance in satisfaction of the decree. It does not appear why Sullivan should have intervened, but it does appear that the arrangement was known and assented to by B. M. Moore and Mrs. Goode, who actively participated in that transaction by signing receipts to the commissioner and by taking from King an option to buy the lands on terms which were equivalent to a redemption.

It is insisted that the conveyance to King was void for the reason that he was without power to purchase because of his relation as an attorney in the case. Nothing is better settled than that the relation between an attorney and client is one of trust and confidence, requiring a high degree of fidelity and good faith; but it is not the law that they may not make valid contracts with each other with reference to the subject-matter of litigation in connection with which the attorney was employed. The rule is stated in 6 C. J., title, Attorney and Client, § 211, page 687, as follows: "There is no necessary incapacity for dealing between client and attorney, and, although transactions between them will be closely scrutinized, yet those which are obviously fair and just will be upheld. To entitle the client to relief from a contract or agreement entered into with his attor-

ney, it must be shown that the client has suffered some injury through an abuse of confidence on the part of his attorney." See also *Lytle* v. *State,* 17 Ark. 608; *Drennen* v. *Walker,* 21 Ark. 539; *Thweatt* v. *Freeman,* 73 Ark. 575, 84 S. W. 720; *McMillan* v. *Brookfield,* 150 Ark. 518, 234 S. W. 621; *Swaim* v. *Martin,* 158 Ark. 469, 251 S. W. 26.

We think King's relation to and his contract with his clients passes this test. It appears that he has represented them for a number of years in a lawsuit against which his clients had no valid defense, and that he has never been paid a dollar either as a fee or for his expenses.

As we have said, King did not intend to acquire the title to this property when he advanced the money to save it from sale, and his subsequent conduct indicates great forbearance, and it is our opinion that the deed to him above-mentioned conveyed the title and did not constitute a mortgage or create a trust. However, pursuant to his agreement so to do, when he thus acquired the title, King executed a contract, which the court below construed to be a lease with an option to purchase, wherein B. M. Moore and Mrs. Goode were given three years to repurchase this land. This contract reads as follows:

"This agreement and contract, made and entered into on this 29th day of December, 1927, by and between D. L. King, party of the first part, and Mary Ellen Moore and Benoni Moore, parties of the second part. Whereas the party of the first part has this day purchased from Dr. E. N. F. Sullivan, for a consideration of $8,986.25, the same amount paid by the said Sullivan to W. A. Bowman, for a certain tract of land of about 386 acres, lying in sections six and seven, in township 18 north, range 2 west, known as the Moore farm and lands in the Western District of Lawrence County, which lands were sold by R. B. Warner, as commissioner in chancery, by decree of the chancery court to satisfy a certain judgment in favor of the Bank of Ravenden, assigned to D. L. King, which sum with interest to date amounts to said sum of $8,986.25.

"The said Sullivan has this day by his warranty deed sold and conveyed said lands and premises to the said D. L. King for said sum.

"Now the said parties of the second part being desirous to purchase said farm, land and premises, the said D. L. King hereby gives and grants to said parties of the second part the privilege to repurchase said lands at any time within three years from this date by paying to the said party of the first part or his assigns the said sum of $8,986.25, with interest thereon at the rate of eight per cent. per annum. The parties of the second part to remain in possession of said lands and premises during said time or until some deal shall be made in regard thereto. And to pay the taxes on said lands and keep up the repairs on the farm.

"The parties of the second part in consideration of the premises above stipulated and agree to comply therewith.

"It is further stipulated and agreed that rents from said farm shall be used from year to year to pay the interest on said sum agreed upon by the parties hereto.

"It is further agreed by the parties that in the event the said parties of the second part should negotiate a deal to sell or transfer said lands and premises, the said D. L. King agrees that, upon the full payment of said sum of money paid out by him with 8 per cent. interest per annum, that he will make warranty deed thereto to any person whomsoever the parties of the second part may designate."

Payments amounting only to $375 were made to King under this contract, and this payment was made in 1928. No payments were made in 1929, and King attached a portion of the crop for the rent of that year, claiming as rent a sum equal to the interest on the purchase money. The attached crop was sold under the orders of the court, and it was ordered that the proceeds of the sale be applied to the payment of the rent. The complaint filed in that cause prayed also the cancellation of the contract of sale upon the ground that the parties had refused to perform it and had renounced it as a binding contract.

An answer and cross-complaint was filed by Moore and Mrs. Goode, which raised the issues we have recited, along with a number of others a statement of all of which would protract this opinion to an interminable length. This cross-complaint charged King with infidelity and corruption, and also that through a betrayal of his trust he had apparently acquired the title to the land, and it was prayed that all the proceedings under which he had apparently done so be canceled and set aside. In the alternative it was prayed that judgment be rendered against King for $12,000, the present value of the land, as damages for his betrayal of his trust as an attorney.

There was a general finding in favor of King on all the allegations of the cross-complaint filed against him. The chancellor construed the contract set out above between King and B. M. Moore and Mrs. Goode as creating an option to purchase, which, until the option had been exercised, was a lease for an annual rental equal to the annual interest on the purchase money, the repairs and the taxes on the lands, and upon this finding sustained the attachment for the rent and rendered judgment accordingly. It was further decreed that, inasmuch as B. M. Moore and Mrs. Goode had refused to perform the option contract, and had denied its binding effect and their liability thereunder, the same should be canceled and held for naught, and the present appeal is from that decree.

We think the court correctly construed the contract between King and B. M. Moore and Mrs. Goode. Such contracts are not unusual, and have been frequently upheld and enforced. The third headnote in the case of *Thomas* v. *Johnston,* 78 Ark. 574, 95 S. W. 468, reads as follows: "A landowner may agree with another that the relation of landlord and tenant shall subsist between them until it shall be changed into the relation of vendor and vendee by payment in full of certain amounts named." See also *Ish* v. *Morgan,* 48 Ark. 413, 3 S. W. 440; *Quertermous* v. *Hatfield,* 54 Ark. 16, 14 S. W. 1096; *Carpenter* v. *Thornburn,* 76 Ark. 578, 89 S. W. 1047;

1104

*Levy* v. *McDonnell,* 92 Ark. 324, 122 S. W. 1002; *Smith* v. *Berkau,* 123 Ark. 90, 184 S. W. 429.

We are also of the opinion that the cross-complaint against King was properly dismissed for the want of equity. The undisputed facts are that the lands were about to be sold, and they would, no doubt, have been permanently lost to the Moores, had they been sold. Four days before the date set for the sale King advanced his own money to pay the judgment under which the sale had been ordered. This was done October 24, 1925, and the second sale was not had until December 18, 1926, at which time Bowman bid in the lands for $9,000, and executed a note therefor. He paid no part of the note, yet by consent of all parties the commissioner made Bowman a deed on February 12, 1927, which was approved by the court. Further indulgence was extended by King until December 28, 1927, at which time Bowman conveyed to Sullivan, who, in turn, conveyed to King, and on December 29, 1927, the contract between King and B. M. Moore and Mrs. Goode was executed, with a reduction in the rate of interest provided for in the foreclosure decree.

The conduct of King appears *uberrimae fidei,* and the decree in his favor is therefore in all things affirmed.