HOWARD *v.* RAYNER.

4-4272

Opinion delivered May 11, 1936.

*A. B. Shafer* and *E. C. Gathings,* for appellant.

*R. V. Wheeler, Charles D. Frierson* and *Charles Frierson, Jr.,* for appellee.

BUTLER, J.   On April 10, 1935, the appellant, as half-brother and heir of Ella Wofford, brought this action against the appellee alleging in effect that appellee had procured a deed to certain lands in Crittenden county by reason of undue influence exerted upon the grantor, an aged negro woman, who at the time did not understand the legal effect of her act, but intended only to authorize appellee, her attorney, to more effectively handle her affairs.   There was the further allegation that notwithstanding such fact and in repudiation of the trust reposed in appellee, he claimed to be the absolute owner of the property.   The prayer was that appellee be declared trustee for appellant.   An answer was filed and upon the issue joined and evidence adduced, the court found in favor of the appellee entering a decree dismissing appellant's complaint for want of equity.   From that decree is this appeal.

The land involved consists of a half section in section 9, township 5 north , range 7 east, and a ten-acre tract and eighty acres in section 36 of the same township and range. There were some lots in the town of Edmondson contained in the deed, but these appear to have passed out of the case and no further mention of them will be made.

The 410 acres of land were acquired by William Wofford, a negro man, and upon the land in section 9, he and his wife, Ella Wofford, made their home. He was industrious and frugal, improved the property and was in good circumstances until the latter years of his life. When he became old and no longer able to look after his affairs as in former times, some years before his death, his property became heavily involved. He had given several mortgages which he was unable to pay. Foreclosure suits threatened and he was unable to refinance his obligations or raise the funds for the proper operation of his farm. In this state of his affairs, he employed Mr. Kenneth Rayner, the appellee, who was endeavoring to obtain indulgence from the mortgagees when William Wofford died in the spring of 1933. No one seems to have known the exact age of William Wofford or of his wife, but William was apparently between 75 and 80 years of age at his death. He left a will by which he devised his real property to his wife and bequeathed to her the major portion of his personal property. Rayner became Ella Wofford's attorney, represented her in the matter of probating the will and successfully resisted an attack upon it. He experienced great difficulty in the financing of the farm for the purpose of making a crop in 1933, but finally accomplished this through the means of an administrator who was able to raise the funds necessary for that purpose. Efforts were renewed to refinance the property, but without success, and it was apparent in the latter part of 1933 that foreclosure proceedings would soon be instituted. Ella Wofford and her husband had been married many years and she seems to have been devoted to him and mourned his death to a great degree. He always managed and looked after all their affairs and when he

died she was helpless. It was her desire to be freed of the load of debt and to secure for herself a home for the remainder of her life. This became generally known and there were several who contemplated making some trade with her by which they would take over the farms and assume the debts, giving to her a home and support for the remainder of her life. Nothing came of these, however, largely because of the state of the title and the opinion entertained that it was necessary that Ella proceed through the courts in order to convey title. It seems that William Wofford realized he could never pay off his indebtedness, and a trade was talked of between him and a neighboring white planter by which the latter was to take the farms and give Wofford a certain tract of land or some other consideration. But this trade fell through because of the interference of some of the old negro's advisers. The fact further appears that William Wofford was unable to finance his farming operations for 1933 and no arrangement for that purpose had been effected prior to his death. In the course of events relating to Ella Wofford's affairs, however, nothing had been done to relieve her financial situation or her distress of mind until the latter part of October, 1933, when Rayner proposed that if she would deed him the property he would give her a home, manage the farms, and try to pay off the obligations. Ella agreed to this and the deed which is the subject-matter of this litigation was the result.

The law governing the relation and dealings between attorneys and clients is well settled, about which learned counsel for the litigants in this case are agreed. The principles applicable have been well stated in cases cited by appellant and appellee. We quote first from 3 A. & E. Enc. of Law, p. 33, and *Thomas* v. *Turner's Admr.,* 87 Va. 1, 12 S. E. 149, cited with approval in *Thweatt* v. *Freeman,* 73 Ark. 575, 84 S. W. 720. "Equity regards the relation of attorney and client much in the same light as that of guardian and ward, and will relieve a client from hard bargains, or from an undue advantage secured over him by his attorney. And the client, in order to secure such relief, is not

bound to show that there has been any imposition or fraud, nor is the transaction necessarily void; but if it is a transaction in which the relation between the parties exerted or might reasonably have exerted any influence in the attorney's favor, then the burden of establishing its perfect fairness is thrown upon the attorney.''

''It is the duty of an attorney to give his client the benefit of his best judgment, advice and exertion and it would be a just reproach to the law if he were permitted to bring his own personal interest into conflict with that duty by securing a benefit to himself through the influence which the relation implies. All transactions between the parties, to be upheld in a court of equity, must be *uberrima fides,* and the *onus* is on the attorney to show not only that no undue influence was used, or advantage taken, but that he gave his client all the information and advice as against himself that was necessary to enable him to act understandingly. He must show, in other words, (1) that the transaction was perfectly fair, (2) that it was entered into by the client freely, and (3) that it was entered into with such a full understanding of the nature and extent of his rights as to enable the client to thoroughly comprehend the scope and effect of it.''

Quoting from 6 C. J., § 211, p. 687, cited with approval in *Goode* v. *King,* 189 Ark. 1093, 76 S. W. (2d) 300, ''There is no necessary incapacity for dealing between clients and attorney, and, although transactions between them will be closely scrutinized, yet those which are obviously fair and just will be upheld. To entitle the client to relief from a contract or agreement entered into with his attorney, it must be shown that the client has suffered some injury through an abuse of confidence on the part of his attorney.''

The evidence, with respect to the execution of the deed and the circumstances immediately preceding, to which these principles are applicable, is not in dispute. It is in effect as follows: Ella Wofford was in Memphis on a visit when the agreement between her and Mr. Rayner was made. In company with Mr. Rayner and two of her colored friends, a man and a woman, she went to

the office of one of the leading attorneys of the city of Memphis with whom Mr. Rayner had, perhaps, previously conversed with relation to the consummation of the agreement between himself and Ella Wofford. When the purpose of their visit was made known, the attorney suggested that Mr. Rayner be absent during the conversation he (the attorney) was to have with Ella. Accordingly, Mr. Rayner left and the attorney proceeded to interrogate Ella with respect to the disposition of her property, and her reasons for the proposed conveyance of it to Mr. Rayner. She indicated to the attorney what her desires were and he advised her as to the method to be employed to carry those desires into effect. On that occasion she appeared to thoroughly understand the plan and left the attorney's office with the purpose of returning when the necessary instruments were prepared to execute the same. Later, with her two colored friends, she did return to the office of the attorney and the papers prepared were read over and thoroughly explained to her. The first was the deed reciting a nominal consideration, and the other was a contract in which that consideration was explained and set out in detail, to the effect that Mr. Rayner would take charge of the properties, endeavor to pay off the indebtedness, and provide a home for Ella consisting of a dwelling house and a few acres adjoining. The meaning and effect of the deed and collateral contract was again explained to Ella, and pains were taken to see that she understood thoroughly what the effect would be. She declared that she did understand, and that the deed and contract accomplished the thing she wanted done. The friends of Ella, who had accompanied her, corroborated the testimony of the attorney and testified that she expressed to them that she had accomplished the purpose she had in mind. Others who testified in the case, stated that she appeared to be greatly relieved and thoroughly satisfied with what she had done. It was in evidence that in addition to the stipulations in the written contract prepared by the attorney, Mr. Rayner had made Ella other promises to the effect that he would look after her and give her half-brother a home and the use of ten acres of

land in section 36. It appears that Rayner carried out these verbal promises. He permitted the half-brother to remain in possession of the ten acres of land and to use it until he died some time during the year, 1935. Also, after the execution of the deed, Ella, at the direction of Rayner, went to a mercantile establishment in Memphis and bought articles for her personal use which were charged to Rayner's account. A few days after the execution of the deed she became ill. Rayner learned of this and left his home in Memphis and went to Ella's home in Crittenden county where he found a doctor in attendance. He wanted to remove the old woman to a hospital in Memphis, but the doctor advised against this. Rayner then told the doctor to visit Ella as often as required, and told others in attendance to procure for her everything necessary and, in event they could not get it there, to telephone him in Memphis. It developed that Ella was afflicted with a mortal illness and she died the night after Rayner's visit. When apprised of her death, Rayner again went to her home and procured for her body decent interment and paid the necessary expenses.

As tending to support the contention that Rayner had unduly influenced Ella and procured property the value of which was greatly in excess of the obligation he had assumed and the indebtedness for which the property was burdened, some eleven or, twelve witnesses were introduced by the appellant to establish the value of the property conveyed by Ella to Rayner. About an equal number of witnesses testified on behalf of the appellee.

From this testimony it appears certain that the 320 acres of land in section 9 was naturally very fertile and well drained, while the 80 acres in section 36 was not well adapted to the growth of staple crops, and its chief value lay in its location with respect to highways on which it fronted on two sides. The fact was further established that at the time of the conveyance attacked in this action both the 320-acre and 80-acre tracts were in a bad state of repair, a part of the 320-acre tract having noxious grasses upon it, and the tenant houses in a dilapidated condition.

The witnesses for the appellant testified that in their opinion the 320-acre tract in the fall of 1933 could have been sold for from $60 to $65 an acre, and the value at that time placed on the 80-acre tract was from $30 to $40 per acre. Some witnesses testified, without naming the date, that the larger tract had a market value of from $70 to $75 an acre. The witnesses called by the appellee appear to have been equally as well qualified to judge the market value of the lands involved as those who testified on behalf of the appellant. Several of these placed the value of the larger tract in the fall of 1933 at $30 an acre. Two witnesses placed it at from $40 to $50, another at $40, two at from $25 to $30, and two at $25 an acre. The values, as placed upon the property by appellant's witnesses, when averaged, approximate $55 an acre, and as placed by witnesses for the appellee at $35 an acre. The witnesses for appellee place the value of the 80-acre tract at about $20 an acre. In giving a basis for the values fixed by them, some of the witnesses for the appellee took into consideration the fact that the farms were in a bad state of repair and the general economic situation prevailing in the fall of 1933. It was in evidence that at that time the market value of farm lands had greatly depreciated, in fact, there was practically no market or transfers except under foreclosure proceedings. As tending to show the value of the equity of William Wofford, it is a significant fact that it was not deemed sufficient by parties approached for the purpose of obtaining additional advances to justify same.

There is little, if any, dispute as to the amount of the debts secured by mortgages, and the amount of taxes which stood as a charge on the lands which, at the time of the conveyance to Rayner, approximated $13,000. Considering the values as placed by witnesses for the appellee, the advantage to Rayner, as viewed under conditions prevailing at the time the deed was executed, was very problematical, and it must be also taken into consideration that in order to operate the farms Rayner must have necessarily financed them, which, in the light of experience, is a hazardous undertaking.

It was the conclusion of the chancellor that the appellee had affirmatively shown that the transaction was fair, entered into by his client freely, and with a full understanding of its nature and effect, and we cannot say that his conclusion was against the preponderance of the evidence. Therefore, under well settled principles, the decree is affirmed.

HUMPHREYS and MEHAFFY, JJ., dissent.