# Richmond

## SARAH ELIZABETH SAWYER v. BLANCHE L. MATTHEWS, AND OTHERS.

March 12, 1936.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Chinn, JJ.

The opinion states the case.

*James G. Martin & Son,* for the appellant.

*William H. Sands, Ivor A. Page, Jr., Vandeventer & Black, Edward Brockenbrough* and *E. L. Breeden, Jr.,* for the appellees.

CHINN, J., delivered the opinion of the court.

This is a bill in equity brought by the appellee, Blanche L. Matthews, against Sarah Elizabeth Sawyer, appellant, to have declared valid a certain writing, dated November 7, 1928, purporting to be a deed of gift from the appellant to the appellee, and the rights of the appellee in the property therein mentioned ascertained and determined.

The paper referred to reads as follows:

"KNOW ALL MEN BY THESE PRESENTS, that I, Sarah Elizabeth Sawyer, in consideration of $1.00 cash in

hand paid, and in consideration of my natural love and affection for my daughter, and of her promise to allow me the income thereon for and during my natural lifetime, and of her promise in event of my death before the death of my husband, Edward C. Sawyer, to pay to my said husband for and during his natural life, the sum of Three Hundred ($300.00) Dollars per month, payable on or before the 5th of each month, do hereby grant, give, sell, assign, set over and deliver to my daughter, Blanche L. Matthews, all my stocks, bonds, notes and all other personal property deposited by me in the safety deposit vault in the Norfolk National Bank of Commerce & Trusts of Norfolk, Virginia, rented in the name of myself and of my daughter, Blanche L. Matthews. This instrument shall serve immediately to transfer the ownership of any future personal property I may acquire from time to time and deposit in said safety deposit vault so leased in the name of myself and of my daughter, as fully and completely as if said property were now in said vault. It is my full intent and purpose testified to by signing this bill of sale, to presently pass title to such personal property as may be located in said vault, and to pass title to any future personal property I may place in said vault immediately upon its being so placed therein.

"I further declare that this transfer is made entirely at my own suggestion, without the request of my daughter or of any other person, and without being influenced so to do in the slightest degree by my said daughter, her husband, or any other living person.

"Witness my hand and seal this the 7th day of November, 1928.

"Sarah Elizabeth Sawyer   (Seal).

"Witness Sig:
"A. G. Dunton."

Blanche L. Matthews, the wife of L. P. Matthews, is the daughter of Sarah Elizabeth Sawyer by her first marriage, and her only child. Edward C. Sawyer, the second husband of Sarah Elizabeth Sawyer, had also been previ-

ously married and divorced from his first wife, by whom he has living children.

Mrs. Sawyer, the appellant, does not deny the execution of the deed of gift, but claims that, by reason of fraud and deceit practiced upon her when she signed it, she thought she was signing a will. Mrs. Matthews, the donee of the gift, claims on the other hand that her mother signed the instrument with full knowledge of its character and purport and the same is valid. The lower court after hearing the evidence *ore tenus* held the deed of gift valid. From that decree Mrs. Sawyer took this appeal.

The main question in the case is whether or not Mrs. Sawyer was deceived when she signed the deed of gift, and whether or not she thought she was signing a will. The paper was prepared by L. P. Matthews, husband of the appellee, who at that time was a practicing attorney in the city of Norfolk, and had represented his mother-in-law in her legal affairs for a number of years. It is undisputed that the paper was signed in Matthews' office in the National Bank of Commerce Building, Norfolk, Virginia, in the presence of Mr. and Mrs. Matthews, a Mrs. Aldrich, who took the acknowledgment as notary, and who was Mr. Matthews' stenographer, and Mr. A. G. Dunton, an attorney, at that time a partner of Matthews, who witnessed Mrs. Sawyer's signature.

It was testified by Mr. and Mrs. Matthews and Mr. Dunton that when Mrs. Sawyer signed the paper she was seated at a desk in Mr. Matthews' office with the paper spread out before her, and with the other parties mentioned gathered immediately around the desk at the same time. It was further testified by Mrs. Matthews that immediately upon execution of the deed of gift it was delivered to her by Mrs. Sawyer, and thereupon the two of them left with the securities mentioned in the deed of gift, went downstairs in the same building and rented a safe deposit box in the bank's vault; that the securities were examined by both parties and were then placed in the safe deposit box along with the deed of gift. The box was

rented in the name of "Sarah Elizabeth Sawyer, Blanche L. Matthews, deputy," and Mrs. Sawyer and Mrs. Matthews were each delivered a key to the box, which gave Mrs. Matthews the right to open it at any time she pleased without the consent or presence of Mrs. Sawyer.

In September, 1932, Mrs. Sawyer found that L. P. Matthews had misappropriated interest and dividends on the securities which he was supposed to collect for her benefit and capital sums with which he was entrusted for reinvestment, aggregating in the neighborhood of $30,000. When Mrs. Sawyer discovered this state of affairs she quarreled with Matthews and threatened to have him indicted unless he made restitution. Matthews being unable to do this, Mrs. Sawyer employed Mr. W. W. Old, Jr., an attorney, to take the matter up for her, and by threats of prosecution she obtained from Matthews confessions as to his defalcations and also certain forgeries in regard to matters affecting the property assigned under the deed of gift. She also made an effort through her attorney, Mr. Old, and by her own threats of prosecution of Matthews to obtain Mrs. Matthews' signature to a release of the deed of gift. Failing in this, on November 1, 1933, Mrs. Sawyer wrote a letter to Mrs. Matthews informing her she had marked the deed of gift void. It was after the receipt of this letter that Mrs. Matthews instituted this suit.

To sustain her contention that she was deceived into signing the deed of gift under the belief that it was a will, Mrs. Sawyer relies entirely upon her own testimony. She testifies that in 1928 she told L. P. Matthews and her daughter that she was going to make a will leaving her property to her daughter, with an income of $300 per month to go to Mr. Sawyer should he survive his wife; that Matthews asked her to let him write the will, and as he had always attended to her legal business and she trusted him, she consented.

This is denied by Matthews, who testified that he prepared the deed of gift solely in accordance with Mrs. Saw-

yer's request. It is also testified by Mr. and Mrs. Matthews that Mrs. Sawyer's motive for making the deed of gift was to prevent Mr. Sawyer's children by his first wife from getting any of her property. They say Mrs. Sawyer told them she had learned that Mr. Sawyer's children were writing to him for money, and she was very much disturbed about it and wanted a paper prepared that would transfer everything that she had immediately to her daughter, Blanche, in such a way it would not be contested in court successfully. Mrs. Sawyer does not deny this conversation took place, but says there is no truth in the statement that she was trying to put her property beyond the reach of her husband's relatives. She is further contradicted as to this, however, by her own brother, F. J. Setchell, who testified she told him she was concerned about the possibility that her husband's children would get hold of some of the property, that she would see to it that they "didn't get anything," and wanted Setchell to spy on her husband to see whether he was getting mail from his children. She further told this witness she knew Mr. Sawyer's children were trying to ruin him, "and if I have trouble with him I want to send the securities to you in Chicago, and you rent a box and put them in there for me." "Will you?" "And I said I would." This conversation was in the summer of 1927 or 1928.

Mrs. Sawyer's account of the execution of the paper is as follows:

"In his office he brought me this and said, 'Here is your will.' He said—being in a hurry, both of them, to leave, he said, 'You sign it right there,' and he put this paper just in front of me like this to sign and I signed my name on it. First, before I signed it, I said, 'Pres, I want it understood,' I said, 'That I can change my will any time I want to,' and he said, 'You can do it, do anything you like with it,' and I signed it."

Mrs. Sawyer at first testified that at the time the document in question was signed the paper was folded and she was shown a line on which to sign. She afterwards

said that the paper was partly open, but, although she thought it was her will, she did not read it. The only reason she gives for not reading the paper is that Mr. and Mrs. Matthews were in a hurry. This does not harmonize with the testimony of Mr. Dunton and the other witnesses, that Dunton took time to witness the paper, Mrs. Matthews to read it, and a notary to take the acknowledgment; that the paper was lying flat and entirely open on the desk, and even a hasty glance at it would have shown it was not a will. Dunton did not read it, but testified that he knew simply by looking at the face of the paper that it was not a will, and nothing whatever was said about the paper being a will.

Mrs. Sawyer also declares that the paper was never delivered to Mrs. Matthews, but she took it home with her and put it away without reading it, and after keeping it for four years took occasion to show it to a Mr. Simpson, manager of the hotel in which she lived, and still without reading it, on Simpson's advice marked it void. In fact, according to her testimony she had never read the paper up to the time of the trial, although she had endeavored to cancel it on the ground that the document was not a will as she thought when she signed it but a deed of gift. This almost incredible statement is obviously intended as an excuse on the part of Mrs. Sawyer for not having undertaken to repudiate the instrument until after she had found out about Matthews' misappropriations. Her entire testimony on the subject is also totally inconsistent with the fact that she went downstairs with her daughter immediately after the instrument was executed and rented a safe deposit box in their joint names, and placed therein the securities which are transferred by the deed of gift, to which her daughter was given access. If she had thought the paper was a will, as she claims, there could have been no purpose whatever in renting a box in the joint names of herself and her daughter, and giving her daughter control over the securities they then deposited in the box. On the other hand, this action on the part of

Mrs. Sawyer is entirely consistent with the making of the deed of gift she had executed.

It may also be observed that Mrs. Sawyer first claimed that she had rented a box for a long time at the Bank of Commerce, and that she had simply arranged to allow her daughter to enter this old box, and denies that she and Mrs. Matthews went together to the box. In this she was contradicted, not only by the witnesses hereinbefore mentioned, but also by J. A. Coleman, who was in charge of the safe deposit vault of the bank, and who testified that the box rented on November 7, 1928, was a new box, and that Mr. and Mrs. Sawyer had given up their old box some years before; that on November 7, 1928, both Mrs. Sawyer and Mrs. Matthews were present and that the bank's record showed all of this. Mr. Dunton also testified that he remembered the conversation when the deed of gift was signed in Matthews' office with reference to renting a safe deposit box, and that Mrs. Matthews and Mrs. Sawyer left the office together presumably for that purpose.

It further appears that after Mrs. Sawyer had engaged Mr. Old as her attorney for the purpose of making an effort to invalidate the deed of gift, on November 1, 1933, Mr. Old dictated the following letter to Mrs. Matthews, which was signed by Mrs. Sawyer and addressed and mailed by her to her daughter:

"Dear Blanche:-

"On November 7th, 1928, I executed a paper giving to you all my stocks, bonds, notes &c., subject to certain allowances to me during my life; and, after my death, to your father.

"At the time of the execution of this paper I had no knowledge that, even since 1922 or 1923, your husband collected certain monies belonging to me, without paying same to me, such monies having not been paid to me to date; delivered to me worthless notes &c.

"For this reason, also because I have not received the income on the monies invested by me through your hus-

band, or on the monies he had invested for me and afterwards received by him in cash, I am giving you notice that I have canceled the said paper; and same is void and of no effect.

"Sincerely,

"Sarah E. Sawyer."

It is testified by Mr. Old that at the time he dictated this letter Mrs. Sawyer either read it or had it read to her, and yet she did not tell Mr. Old, and she made no claim at that time, that she thought the paper in controversy was a will as she now claims. In this letter, as seen, there is not a word about fraud or mention of a will, but she makes a plain statement that she was canceling the deed of gift because she discovered since its execution that Matthews had long since collected money belonging to her which he had failed to account for. This letter alone seems to make it manifest that the defense set up by Mrs. Matthews in this suit, that she thought the deed of gift was a will, is an afterthought on her part.

It also appears that contemporaneously with the execution of the paper in question certain letters, which are set out in the record, were exchanged between the parties, which clearly show that the parties all understood that the paper was a deed of gift and not a will. One is a letter from Mrs. Matthews to her mother, Mrs. Sawyer; another a letter from Mrs. Matthews to Mr. Sawyer; and another a letter from Mr. Sawyer to Mrs. Matthews.

It is admitted by Mrs. Sawyer that these letters were all turned over to her on the occasion in question and folded with the deed of gift, and, according to her testimony, were in her possession from the 7th day of November, 1928, until the institution of this suit. She also testifies that she marked these papers void at the same time that she marked the deed of gift void.

It is argued that the fact that Mrs. Sawyer had a key to the safe deposit box and continued to exercise control over the securities after the deed of gift was executed indicated that Mrs. Sawyer was still owner of the securities. The

evidence shows, however, that Mrs. Matthews had a right to enter the box at any time with or without Mrs. Sawyer being present, and to all intents and purposes the two stood on an equal footing in so far as the control of the box was concerned. Looking at the surrounding circumstances, and the intent and understanding of the parties, this situation seems perfectly consistent with the provisions of the deed of gift. Mrs. Sawyer was entitled to the income derived from the securities for the term of her natural life. She was a woman of large business experience and acumen. Mrs. Matthews was entirely inexperienced in business and knew nothing in regard to the investment of funds. Besides, she knew that her husband would be consulted as to these investments. Mother and daughter were then on the best of terms. It would, therefore, have been unreasonable and unnatural if Mrs. Matthews had demanded of her mother, who had just made a gift to her of her property, sole control of the securities as well as the investments thereof. She had a perfect right to assume that her rights to the securities were fully protected and secured under the instrument which had at that day been executed and deposited in the box along with them.

It is also argued that the fact that Mrs. Matthews surrendered her key to the safe deposit box when her mother requested it is significant. It seems that on November 7, 1932, Mrs. Sawyer asked Mrs. Matthews if she had the key to the box, and said, "Will you let me have it?" and she gave it to her. At that time, however, no question as to the validity of the deed of gift had arisen, and Mrs. Matthews, therefore, had no reason to think that the surrender of the key would have any effect on the deed of gift. Mrs. Sawyer did not intimate why she wanted the key and Mrs. Matthews did not ask her, but thought she might have lost her key. In any event, we do not think that this occurrence can be construed as an agreement on the part of Mrs. Matthews to a cancellation of the deed of gift, and the surrender of her rights thereunder. As pre-

viously stated, Mrs. Matthews afterward positively refused to sign the release of the deed of gift despite the efforts of Mr. Old and Mrs. Sawyer to induce her to do so.

Stress is placed on the circumstances that in a letter from Mrs. Matthews to her mother she referred to the box as "your box" and said she would not enter the box unless her mother told her to. What has been said in reference to the key, we think is applicable here, and it may be also stated that at this time Mrs. Sawyer was after Matthews about his defalcations, and Mrs. Matthews was endeavoring to help her husband by placating her mother as much as possible. It may also be noted that in the letter hereinbefore referred to of November 7, 1928, Mrs. Matthews referred to the box as "our safety deposit vault."

Point is made of the fact that Mrs. Matthews owed Mrs. Sawyer a note for $1,200 secured on real estate, which note was in the box, and default having been made in the payment of the interest, Mrs. Matthews and her husband conveyed the real estate to Mrs. Sawyer in lieu of foreclosure. It is argued that this is inconsistent with Mrs. Matthews' ownership of the securities. When it is remembered, however, that Mrs. Sawyer was entitled to the interest on this note, and in default of the payment thereof had a right to demand payment in order to re-invest the principal, we can see no significance in this. Besides, Mrs. Sawyer was threatening to prosecute Mr. Matthews, and his wife was anxious to do all she could to hold her mother off.

Considering all the testimony on the subject of fraud and deceit in the procurement of the deed of gift, we are of the opinion that the learned chancellor of the court below was clearly right in sustaining the validity of the instrument in question. It is impossible to read the testimony given by Mrs. Sawyer without coming to the conclusion that her claim that she was deceived into signing the deed of gift is based upon fictitious grounds. Her testimony, of itself, is too replete with inconsistencies and improbabilities, and contradicted in too many instances

by disinterested witnesses and the surrounding facts and circumstances, to be given credence. We think it clear that she executed the deed of gift with the full knowledge of its purport and for the purpose of placing her property beyond the reach of her husband's children, and undertook to invalidate the deed solely because of Matthews' perfidious conduct towards her. His behavior, however, though it may have justly aroused the indignation of Mrs. Sawyer, does not entitle her to revoke the instrument which she voluntarily executed to her daughter in order to carry out her own purposes.

It is next claimed that "even if the paper in question were intended by Mrs. Sawyer as a deed of gift, still it would be voidable, and invalid, because arranged through Mrs. Sawyer's trusted lawyer in favor of that lawyer's own wife, which, on principle, is the same as if the deed of gift were to the lawyer himself." In other words, it is claimed that the same rule should apply as in transactions between attorney and client for the attorney's benefit, and that this rule is that the transaction is presumptively invalid.

The true rule is as stated in *Bruce's Ex'x* v. *Bibb's Ex'x,* 129 Va. 45, 105 S. E. 570, 572, where the lawyer himself was the beneficiary, and the court said:

"While some cases have held that all such transactions are voidable at the election of the client, the better rule and the one established by the preponderance of authority does not go so far. Although such transactions will be closely and carefully scrutinized, yet those which are obviously fair and just will be upheld, and the client is not entitled to absolute relief from such a contract, unless it be shown that he has suffered some injury through an abuse of confidence on the part of his attorney. 6 C. J. 686."

It is next contended that "the paper in question, even if intended as a deed of gift, and even if delivered, was void for uncertainty, nothing being in the box at the moment * * *."

We do not think the contention is sound. The securities were placed in the box immediately after the delivery of the deed of gift which was placed in the box at the same time. While the deed itself did not enumerate the securities, it describes the property transferred so as to give sufficient means of identification, which is all that is necessary.

In 6 R. C. L., page 645, it is said: "However, the law does not favor, but leans against the destruction of contracts because of uncertainty. Therefore the courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained. Though there are some formal imperfections in a written contract, still it is sufficient if it contains matter which will enable the court to ascertain the terms and conditions on which the parties intended to bind themselves. The maxim *Id certum est, quod certum reddi potest* applies."

"Whether a contract under which the amount or quantity is not stated specifically is enforceable seems to depend on whether such amount is ascertainable." Id., p. 647.

The decree entered by the court below refers the cause to one of the commissioners in chancery of the court to inquire and report as to what securities were deposited in the safe deposit box in question on November 7, 1928, and also what stocks, bonds, and other securities were thereafter deposited in the same box by said Elizabeth Sawyer before she gave up the rental of the box in 1932. The question, therefore, whether the securities transferred by the deed of gift can be identified and ascertained, remains for the future determination of the trial court, and is not now before us.

The action of the lower court in excluding the evidence of R. H. Simpson to the effect that in November, 1932, Mrs. Sawyer showed him the paper in question and told him it was her will, and marked it void, is assigned as error. We find no merit in this assignment. The fact

that Mrs. Sawyer called the paper a will after she had discovered Matthews' defalcations, and while she was planning to avoid the deed of gift on the ground that she thought it was a will, adds no weight to what she said on the witness stand that we can see, and is a self-serving declaration. Besides, it appears from the record that this witness was afterwards allowed to testify that Mrs. Sawyer spoke of the paper as a will, and he understood from what she said it was a will. Under these circumstances, we think the error complained of, if any, was harmless.

In conclusion it may be said that the learned judge of the court below, having heard the evidence *ore tenus,* had a full opportunity to observe all the witnesses, and to get an insight into the characters of the witnesses and litigants, and judge their credibility. Under these circumstances, his opinion is entitled to much weight.

In the case of *Pryor* v. *East,* 150 Va. 231, 142 S.E. 361, 362, Chief Justice Campbell said: "The chancellor, upon this question of fact, held with the complainants and it is well settled that where the court below has, upon the evidence, determined a question of fact, the appellate tribunal will not overturn its decision, except where there is manifest error or misconduct. *Womack* v. *Tankersley,* 78 Va. 242."

And by Justice Holt in *Hartman* v. *Melfa Banking Company,* 162 Va. 433, 436, 174 S. E. 653, 654: "When a case is heard by a judge in open court without the intervention of a jury, his judgment upon a conflict of evidence has the same weight as the jury's verdict (*Seventh St. Gar. Co.* v. *Mercer,* 150 Va. 269, 142 S. E. 350), and this is true in chancery where the evidence is given in open court."

For the foregoing reasons the decree of the lower court is affirmed.

*Affirmed.*